No. 80-204

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

CHARLES F. REID,

Plaintifff and Appellant,

-vs-

PARK COUNTY, MONTANA, et al.,

Defendants and Respondents.

Appeal from: District Court of the Sixth Judicial District,
In and for the County of Park, The Honorable
Jack D. Shanstrom, Judge presiding.

Counsel of Record:

For Appellant:

Yardley and Yardley, Livingston, Montana

For Respondent:

Bruce E. Becker, County Attorney, Livingston,
Montana

Submitted on Briefs: September 17, 1980

Decided: APR 30 1981

Filed: APR 30 1981

Thomas J. Kearney
Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

The landowner, Charles Reid, plaintiff, appeals from a judgment of the Park County District Court refusing to quiet title in a road crossing his property and also holding that Park County, one of the defendants, had established a public road pursuant to statutes then in effect.

The landowner brought the action in April 1979. Park County, as one of the defendants, claimed that the Park County Commission had created a public road in 1905, and, alternatively, that the road had become a public one by prescriptive use. The trial court held that the commissioners had created the road by statutory proceedings in 1905 and that any defects in the procedure were cured by section 32-103, R.C.M. 1947 (now repealed). The trial court did not, however, rule on the County's claim that the road had also become public by prescriptive use. Unfortunately, neither party then asked the trial court to complete the trial picture by also ruling on the claim of prescriptive use.

The landowner first claims that the curative statute applied by the trial court does not cure jurisdictional defects, and therefore, that there is no basis for a ruling that the county commissioners had properly established a public road in 1905. The landowner also contends that in any event, the trial court cannot be affirmed because the evidence in any event fails to establish a basis for a finding of presumptive use. The landowner concedes, however, that the road to Vicars' Gate (described later) is a public road acquired by prescriptive use.

Based on Warren v. Choteau County (1928), 82 Mont. 115, 265 P. 676, which holds that no facts will be presumed in

-2-

the aid of jurisdiction to establish a road and therefore that the jurisdiction must be shown on the face of the proceedings undertaken to create the road, the landowner contends that the curative statute could not cure the defects here. The landowner claims the proceedings of the commission were defective because: the County failed to produce a copy of the petition showing a description of the road or that it was signed by ten qualified petitioners (and this allegation is undisputed); that the records failed to show that the commissioners gave notice to the affected landowners (this allegation is undisputed).

The County, on the other hand, relies on a statutory presumption, section 26-1-602(15), MCA, which establishes a disputable presumption that official duty has been regularly performed. The County makes no attempt to distinguish the Warren case, but relies entirely on this presumption and on the curative statute, section 32-103, supra. The County failed to submit a brief on its alternative theory of prescriptive use and requests that if we reach this issue that we give the County the opportunity to set out the evidence in supporting a ruling of prescriptive use.

The trial court, relying on the curative statute (section 32-103) and on State v. Auchard (1898), 22 Mont. 14, 55 P. 361, ruled that the curative statute remedies all the defects in the proceedings undertaken to establish a public road. But even Auchard holds that the curative statute will not cure a jurisdictional defect. 22 Mont. at 16. The record of the county commissioner proceedings from 1903-1905 fails to establish that the county commissioners had originally acquired jurisdiction. Strict adherence to Auchard and Warren would require jurisdiction to be shown on the face of the proceedings creating a public road. Auchard was decided in

-3-

1898 and Warren in 1928. At those times, it was not an onerous duty to impose on a county that it show it had jurisdiction to create public roads on the face of the records. To presently adhere to the same requirement imposes an unrealistic burden on the public to prove on the face of the record that its public officials had jurisdiction to create a public road. We hold that it is sufficient if the record taken as a whole shows that a public road was created. The record is sufficient here.

We hold also that the public acquired a prescriptive use of the road in question. Even though the trial court did not rule on this issue, we are in a position to do so here because almost all of the evidence on this issue was submitted to the trial court through depositions rather than through live-witness testimony at trial.

We first proceed to the curative statute which the trial court applied. The trial court ruled that it cured any defects that may have taken place during the 1905 proceedings when an obvious effort was made by the county commissioners to establish a road. The curative statute, section 32-103, R.C.M. 1947, in existence until 1959, provides:

> "All highways, roads, . . . laid out or erected by the public, or now traveled or used by the public, or if laid out or erected by others, dedicated or abandoned to the public, or made such by the partition of real property, are public highways."

In 1905, this statute was codified as section 2600 of the Political Code of 1895. The trial court ruled that once jurisdiction was acquired by the petition of the landowners, which was accepted by the commissioners at their April 10, 1904, meeting, the statute remedied all defects. The problem, however, is that the proceedings of the commissioners of record

-4-

fail to show on their face that the county commission had jurisdiction.

The pertinent road-creating statutes in effect in 1904 were sections 2750 through 2771, Civil Code 1895 (all of which were repealed in 1922). These statutes provide that ten freeholders can petition the county commissioner to establish a road described in the petition. The county commissioners then must appoint three persons to view the road and make recommendations on the need for and feasibility of building the proposed road.

The statutes also provide for a hearing so the public could make its views known to the commissioners. If the commissioners decide in favor of a road, they order the road opened and order payment to the consenting landowners. In the case of nonconsenting landowners, they order payment after condemnation proceedings are completed. The statutes also require that either a written conveyance of the right-of-way be filed in the office of the county clerk and recorder or that a copy of the judgment be filed and recorded by the clerk in the event that the road is acquired by condemnation proceedings.

To establish its case, the County introduced the minutes from six meetings of the county commissioners held between 1903 and 1905. The commissioners first considered the road on April 10, 1903. Its minutes show:

> "Upon the petition of Fred Redfield et al. for the laying out of road, the Board appointed as viewers, Joe Murray, D. W. McLeod and George E. Reid to view proposed road and report that action may be taken by the Board at their June meeting."

Minutes from later meetings show that the commissioners took further steps toward establishing a road. On February

-5-

10, 1904, they ordered the road opened. The minutes on that day, show:

> "In the road as petitioned for by Frank W. Redfield, et al., Fred J. Redfield, Patrick Richard, Frank Richard, and George T. Sevals came before the Board and spoke in favor of the granting of the petition, and agreeing to build the necessary fence on the East side of the land of Hollace A. Cook. The Board awarded the sum of $15.00 as damages to Hollace A. Cook, and ordered the road opened as petitioned for."

As we stated earlier, strict adherence to Auchard and Warren would require us to reverse the trial court in its ruling that the curative statute cured all defects. The record fails to establish jurisdiction to create the road within the requirement of Auchard and Warren. At a minimum, Warren requires that the county commissioner proceedings show the required number of petitioners signed the petition and that each of them were freeholders. There is no record here that ten people had petitioned to create a road, nor is there a record that those signing were freeholders. To strictly follow Warren now would mean that we would hold proceedings in 1905 to be jurisdictionally defective. That is why we now adopt the rule that it is sufficient if the record taken as a whole, shows that a public road was created. Otherwise, the burden on the public in a particular case to prove a public road was created so many years ago may well be unsurmountable. Here, the potential hardship is not bad because we also hold that the public acquired the road in question by prescriptive use. But, if we did not now overrule Auchard and Warren on the jurisdictional issue, a private landowner may, in a particular case, be able to keep the public from going through land because the public's records of a road no longer support a determination that the public had originally acquired jurisdiction to create the road.

-6-

We next decide the prescriptive-use issue. We first discuss the procedural problem created by the trial court not ruling on this issue and by counsel not asking the trial court to rule on this issue before an appeal was taken. In support of its alternative claim of prescriptive use, the County submitted testimony and evidence to show the use of the road involved over a period of many years. The County submitted proposed findings and conclusions in support of this theory. But the trial court ruled only on the first theory and held that the County had properly created and opened the road by use of the statutory proceedings, and that the curative statute cured any defects.

Both parties should have asked the trial court to rule on the prescriptive-use issue. If we reversed the trial court on the curative statute issue, it would be in the County's interest to also have a judgment holding that the public had acquired the road by prescriptive use. Its application of the curative statute, the absence of a ruling on the alternative prescriptive-use theory would mean that the case would have to be remanded for a decision on that issue. A decision may well have prompted another appeal by either party receiving the adverse decision. This Court would then be faced with deciding two appeals which could have been decided in one appeal where the trial court had ruled on all the issues raised.

Either party could have secured a ruling from the trial court on the alternative theory by asking the trial court to amend and supplement its findings and conclusions by ruling also on the issue of prescriptive use. As it now stands, we are faced with a record sufficient to establish a prescriptive use, but with no trial court ruling on this issue. In the

-7-

future, we urge both sides of a lawsuit to take proper action to get rulings on all issues raised so that we do not have to decide appeals on a piece-meal basis.

Fortunately, because of the nature of the evidence presented to the trial court on the prescriptive-use issue, we are able to rule on this issue without an initial ruling by the trial court. Almost all of the testimony on this issue was submitted to the trial court through depositions rather than through live-witness testimony at trial. Nine depositions were admitted in evidence, and all of these were offered on the issue of prescriptive use. In the normal case, it would be the task of the trial court to weigh the credibility and demeanor of the witnesses who appear before it at trial, and therefore, we would not be at liberty to dispose of this case on appeal in the absence of a trial court ruling. But where a case is submitted on an issue based almost exclusively on depositions, we are in just as good a position as the trial court to assess the testimony. The trial judge had before him only a written record of the testimony, and we have the same written record before us. We are able to review the depositions just as the trial judge is able to review them. See, Kostbade v. Metier (1967), 150 Mont. 139, 141, 432 P.2d 382, 384; In Re Estate of Jensen (1969), 152 Mont. 495, 500, 452 P.2d 418, 421.

The landowner implicitly acknowledges that this Court can rule on the prescriptive-use issue, for he devotes a good portion of his brief to this issue and does so on the basis that this Court "will affirm a correct result though achieved by a wrong theory." He contends, nevertheless, that there is no substantial evidence in the record to justify a conclusion that a public road has been established

-8-

by adverse use beyond the Vicars' Gate. (The landowner concedes that the public has established a road by adverse use to the north side of the Vicars' Gate.)

The County, unfortunately, has not responded at all on the issue of prescriptive use, but rather has asked this Court to allow it to file an additional brief if we believe it necessary to reach this issue. That, of course, is more than a little presumptuous on the part of the County. Cases on appeal cannot be decided on a piece-meal submission of issues and the County should know this. Therefore, the County should have filed a brief reaching the issue of prescriptive use. Having failed to do so, it has made the task of this Court immensely more difficult.

For the public to acquire a prescriptive use it must be shown that the road followed a definite course, continuously and uninterruptedly for the prescribed period of time. Peasley v. Trosper (1936), 103 Mont. 401, 406, 64 P.2d 109, 110. The statutes then in effect required that the adverse use continue for at least a period of ten years. The trial court made several findings on the use of the road, with which we agree. It found that the road had followed a definite course since the early 1900's when it was first established; that this road had been used from 1904 to 1970 without interruption; but it made no finding that the public used the road crossing the landowner's property in a manner adverse to the interest of the owner. The facts clearly show an early attempt by the Park County Commissioners to create a road, and later use of the road by the public with which no one interferred with for a period of almost 70 years. The landowner concedes this, however, he claims that the public's use of this road stopped at the Vicars' Gate, the place where his agent erected the barricade in 1970.

-9-

Testimony on the use of the road came from thirteen witnesses. Eleven of these thirteen witnesses testified to the use of the road before 1969, the period during which the prescriptive right was claimed to have come into existence. Of these eleven witnesses, nine of them testified by way of deposition.

The area involved is located about seven miles south of Livingston. Through this property runs a road known as the Little Mission Creek Road. This road travels south across the landowner's property for about one mile and continues for a short distance beyond. The road provides access to National Forest Land and to other private land.

The Little Mission Creek Road forks near the center of the landowner's land. One fork turns west for less than one-half mile and ends at the nearby "Seval Ranch." The other fork, the one at issue in this lawsuit, continues south. Immediately to the south of this fork is a gate commonly known as "Vicars' Gate." As previously mentioned, the landowner concedes that the public has established a prescriptive use of the road up to the north side of the "Vicars' Gate." Just south of the Vicars' Gate are buildings once owned by the Vicar family, but now owned by the landowner who here started the quiet title action after barricading the Vicars' Gate. His agent testified the barricade was constructed in order to prevent injury to the road by vehicular travel of the public.

Although there was a clear attempt to create a road, the County, for some reason did not obtain a deeded right of way for the road which crossed the property involved. It is clear, however, that James Vicars, the plaintiff's predecessor in interest, received a deed from the Northern Pacific

-10-

Railway Company on August 3, 1946, which expressly noted that the land was subject to an easement "in the public for any public roads heretofore laid out or established, and now existing over and across any part of the premises." This deed covers the land involved in this lawsuit.

There is clear evidence that the County did lay out a road in the early 1900's in the area involved. Although we have held that the records of the County in the early 1900's fail to establish that the county commissioners acquired jurisdiction to create the road by the statutory procedures then in effect, the evidence is nonetheless clear and undisputed that the County did assume control over the road and maintained it for many years.

A surveyor's field book shows that the road had been surveyed and that the County had worked on the road during the years 1905, 1909 and 1910. The surveyor's book does not show, however, what parts of the road the County had worked during these years. It was also established that the County had maintained the road to the north side of "Vicars' Gate" from 1934 through 1968. One witness, J. L. Lawellin, who worked for the County in 1936, testified that during that year, the County graded the road past the Vicars' Gate all the way to the National Forest. George Stebbins, an employee of the County Road Department from 1937 to 1968, testified that the road was graded by his crew once or twice a year-- but only as far as Vicars' Gate. Several witnesses testified that maintenance of the road south of Vicars' Gate was performed by the local farmers and ranchers.

This evidence undisputably establishes that the County, for at least 63 years (1905 through 1968) was asserting an interest in the road and maintaining the road in some fashion.

-11-

This would not be likely unless the County felt there was a legal obligation to do so. This brings us to Vicars' Gate. In face of all the evidence, the landowner here admits that the public acquired a prescriptive use of the road to the north side of Vicars' Gate. But, he claims that the public use stopped at that point.

The evidence establishes that when Vicars' Gate was first placed across the road, it was not for the purpose of blocking public traffic, but for the purpose of keeping cattle and other livestock from wandering south of the gate. The evidence also establishes that the public regularly used the road south of the Vicars' Gate.

John Hayden, who formerly lived on the land now owned by the plaintiff-landowner, says he first built the gate at Vicars' Place between the years 1922 and 1934, but that he could not remember the year. He said that he did not build the gate to keep the public out, but rather to keep the neighbors' milk cows from straying too far up the road. Most of the witnesses remembered a gate to be located at Vicars' Place, and some even thought there were several gates. But there was no evidence that the gate was ever locked before 1969, when the plaintiff-landowner first locked the gate and later erected a barricade.

There is no question that people regularly used that part of the road extending to the south of Vicars' Gate. Erna Haskins, who lived south of Vicars' Place, used the road from 1912 to 1918 to get to school. After 1918, she and her family continued to use the road several times a year when they went to town. Ilma Malcolm, who lived on the Seval's Ranch from 1906 to 1924, used the road south of Vicars' Place "hundreds of times." Even after she moved

-12-

away from the ranch in 1924, she continued to use the road to visit neighbors. Margaret Seiveno used the road from 1925 to 1949 to drive cattle to the National Forest Land, and to go to her parents' ranch during branding seasons and fall round-up. Ethyl Alt and her family used the road to look for huckleberries during the 1920's and 1930's and to go fishing and camping with her husband during the 1940's. J. L. Lawellin and George Urbach used the road from the 1930's until 1969, when it was barricaded by the plaintiff-landowner. During this time, Lawellin used the road at least six times a year.

Two people who appeared at trial to testify, said that during the 1930's and 1940's they used the road to help their uncle trail sheep and that they used the road every week or two to pick up their mail and supplies. These witnesses, Donald Wood, and Harry Dodge, are nephews of Louie Olson, who lived south of the Vicars' Place.

The road was never ideal for traveling. Erna Haskins said that during the 1910's, it was just a cow trail. Other witnesses described the road as "just a dirt, kind of rocky road," "poor condition," "rutty," etc. Several witnesses testified that in the early years of the road, a horse and buggy or wagon, or a high-centered car, could be taken over the road. According to John Hayden, who lived at the Vicars' Place from about 1923 to 1935, horse and buggies were the normal means of transportation during that time, because there were very few automobiles. Two witnesses testified that during the spring, the road was not passable with a car and that it was necessary to walk.

As we already mentioned, it appears that most of the time the County maintained the road to the south side of

-13-

Vicars' Gate, and that local residents and ranchers maintained most of the road on the south side of the Vicars' Bridge.

Several witnesses testified that they had always thought the road was a public road. Not one witness testified that he had ever asked permission to use the road, even beyond Vicars' Gate.

The evidence overwhelmingly supports a ruling that by the time the plaintiff-landowner locked the gate and later barricaded the road, the public had long since established its right to use the road as a public road.

The judgment is affirmed. The District Court is directed to enter an appropriate order and judgment declaring that a public road was established by use of statutory proceedings then in existence and that a prescriptive use was also established for the public to use the road in question.

_____
                     Justice

We Concur:

_____
        Chief Justice

_____

_____
           Justices

This cause submitted prior to January 5, 1981.