FILED

08/16/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0426

DA 21-0426

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2022 MT 162

FLYING T RANCH, LLC, a Montana limited liability company,

        Plaintiff and Appellee,

    v.

CATLIN RANCH, LP, a Montana limited partnership,

        Defendant and Appellant,

MEAGHER COUNTY BY AND THROUGH ITS COMMISSION,
SCOTT JACKSON, LYNN JACKSON, DEBRA WILLIAMS,
LISA ANDERSON, BERT WILLIAMS AND CONNIE HIX,

        Defendants and Appellees.

_____

CATLIN RANCH, LP, a Montana limited partnership,

        Cross-Claimant,

    v.

DEBRA WILLIAMS, LISA ANDERSON,
BERT WILLIAMS AND CONNIE HIX,

        Cross-claim Defendants.

APPEAL FROM:    District Court of the Fourteenth Judicial District,
                  In and For the County of Meagher, Cause No. DV-19-5
                  Honorable Brenda R. Gilbert, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                Jim Lippert, Jim Lippert Attorney at Law, P.C., Big Timber, Montana

                Vuko J. Voyich, Anderson & Voyich, P.L.L.C., Livingston, Montana

For Appellees:

Brian K. Gallik, Gallik, Bremer & Molloy, P.C., Bozeman, Montana
(*for Flying T Ranch, LLC*)

Susan B. Swimley, Swimley Law Firm, Bozeman, Montana
(*for Meagher County*)

Matthew W. Williams, MW Law, PLLC, Bozeman, Montana
(*for Debra Williams, Bert Williams, Lisa Anderson, and Connie Hix*)

Hanna Warhank, Rachel A. Taylor, Church, Harris, Johnson & Williams, P.C., Great Falls, Montana (*for Scott Jackson and Lynn Jackson*)

Submitted on Briefs: June 8, 2022

Decided: August 16, 2022

Filed:

_____
Clerk

2

Justice Jim Rice delivered the Opinion of the Court.

¶1     Catlin Ranch, LP (Catlin), appeals from the preliminary injunction entered by the Fourteenth Judicial District Court, Meagher County, enjoining Catlin from inhibiting Flying T Ranch, LLC's (Flying T) use of a disputed road over Catlin's property during the pendency of proceedings to determine Flying T's access rights.

¶2     We affirm, and address the following issues raised by Catlin:

*1. Did the District Court manifestly abuse its discretion by issuing a preliminary injunction?*

*2. Did the District Court err by granting preliminary injunctive relief to parties in addition to Flying T?*

*3. Did the District Court err by prematurely ruling on the merits of the case?*

### FACTUAL AND PROCEDURAL BACKGROUND[1]

¶3     Flying T purchased Section 25 of Township 8 North, Range 7 East in Meagher County (Section 25), in April 2014, from Bert and Debra Williams, Lisa Anderson, and Connie Hix (collectively "Williams").  Flying T is a Montana limited liability company consisting of three members who primarily reside outside of Montana and use the property for recreation.  Catlin is a Montana limited partnership engaged in the cattle-ranching business whose holdings include approximately 50,000 acres.  Relevant to this appeal, Catlin owns Sections 11, 14, and 15 of the Township.

---

[1] The facts stated herein are drawn from the record made for purposes of the request for preliminary injunction, and are subject to further proceedings.

3

¶4     The disputed road starts on Catlin's property in Section 15 where it exits Highway 89.  Access is controlled by gates installed by Catlin, and the road then proceeds northeast through Catlin's land in Sections 14 and 11 until it joins the old White Sulphur Springs to Livingston Road (WSS Road) in the southern portion of Section 11.  This initial 1.1 mile stretch of the road linking Highway 89 to WSS Road is referred to as the "Moss Agate Spur."  The Moss Agate Spur and the continuing section of WSS Road at issue in this case are referred to collectively as the Moss Agate Road (MAR).



**Figure 1.**  This map was adapted from an exhibit provided by Flying T.  Its only purpose is to illustrate the location of the disputed road and the relative location of the parties' properties.  MAR consists of the portion of road beginning at "GATE," continuing over the "MAR Spur," and ending at the "Y" split in the road in Section 2.  The hyphen line running northeast of the split represents the Jackson and State Easements leading to Flying T's property in Section 25.

4

¶5 From its confluence with WSS Road, MAR travels north through Catlin's Section 11 and into Section 2, owned by Scott and Lynn Jackson (Jacksons). In the northern portion of Section 2, WSS Road turns northwest toward White Sulphur Springs. At that point, which is the terminus of MAR, a road splits off from WSS Road to the northeast, and continues across Section 35, also owned by Jacksons, and Section 36, owned by the State of Montana. In 2013, Jacksons granted Williams, Flying T's predecessor, a non-exclusive, perpetual easement over their property in Sections 2 and 35. This "Jackson Easement," extending from the terminus of MAR, connects with the easement across Section 36 granted to Williams by the State. Together, the Jackson and State Easements provide Flying T access across these Sections to its property in Section 25 from the point where the road splits from WSS Road in Section 2 (and the terminus of MAR), and these easements are undisputed here. *See Figure 1.*

¶6 Flying T's managing partner Todd Timbrook (Timbrook) first used MAR to access Section 25 when viewing the property for potential purchase with real estate agents in Fall 2013. At the time of purchase, Timbrook understood access to Section 25 was "free and clear," beginning from Highway 89 in Section 15, proceeding on MAR, and then over the Jackson and State Easements. Shortly after purchasing the property in April 2014, Flying T began construction of a cabin on Section 25 for recreational use by its members. It spent approximately $500,000 constructing the structure and improving the property, using MAR to transport equipment, lumber, and other building materials to the construction site in

5

Section 25. At its expense, Flying T improved MAR, primarily on the portion of the road crossing Catlin's property.

¶7 Catlin did not immediately take any action in response to Flying T's use or improvement of MAR, but in June 2014 locked the gate at the entry in Section 15. Catlin called the sheriff to report cement trucks using MAR to access Flying T's property as trespassers. Flying T's title insurance company, First American Title Insurance Company (First American), provided Flying T and a sheriff's deputy with a document purporting to demonstrate MAR was a county road abandoned in 1969, but that access rights for area property owners, including the owner of Section 25, had been reserved. The deputy showed the document to Catlin, and in response, Catlin removed the lock. Flying T's cabin was substantially completed in September 2014, and the membership used the property for archery hunting that fall, accessing it by MAR. For three years thereafter, Flying T's members exercised uninhibited access to Section 25 via MAR.

¶8 In September 2017, members of Flying T arrived at the entrance to MAR on Section 15 and found the gate locked. Timbrook cut the chain and replaced it with a Flying T lock, and the members and their contractors accessed the property through the gate for several weeks thereafter, until Catlin replaced the lock over Flying T's protest. Catlin consulted the Meagher County attorney, who opined Flying T lacked legal access to MAR, and thus Catlin continued to block access. Flying T began utilizing an alternate, unimproved route to the property from the north, but suspended family visits to the property and scheduled

6

improvements because of access difficulties, including an inability to bring necessary machinery and supplies to the property over the alternate route.

¶9 In October 2017, Flying T tendered a claim under its First American title policy for lack of access.[2] First American assigned legal counsel to Flying T and began exploring solutions to secure access for Flying T, including purchase of an easement over MAR, bringing an action against Catlin, or making improvements to potential alternate routes. Road improvements were potentially costly, and in May 2019, Flying T learned that First American intended only to secure an easement over an alternate, unimproved access road. Flying T objected, and brought an action against First American seeking damages.

¶10 Also in May, Flying T filed a complaint against Catlin alleging Flying T had legal access to MAR under numerous theories, and requested preliminary injunctive relief, including a temporary restraining order, and permanent injunctive relief restraining Catlin from interfering with Flying T's access over the portion of MAR running through Catlin's land. Catlin moved to stay the proceedings pending resolution of Flying T's action against First American, arguing Flying T's claims against Catlin were duplicative of those against First American, and if Flying T was successful in its suit for damages against First American, "there would be no need for the suit against Catlin to continue, because [Flying T] will have been made 'whole.'" The District Court granted the stay request, which this

---

[2] First American is not a party to this action. The facts included herein regarding First American's involvement are based upon allegations in Flying T's complaint. We recite these facts for context and not as a definitive account of what transpired between Flying T and First American, nor as an endorsement of the truth of the assertions.

Court reversed in April 2020, holding the District Court erred by effectively denying Flying T's motion for preliminary injunction without a hearing. *Flying T Ranch, LLC v. Catlin Ranch, LP*, 2020 MT 99, ¶ 18, 400 Mont. 1, 462 P.3d 218 (*Flying T I*).

¶11 Following remand, Jacksons advised Flying T they intended to cooperate with Catlin and block Flying T's access to MAR where it crosses Section 2 of their property. In its August 13, 2020 First Amended and Supplemental Complaint, Flying T added Williams, Jacksons, and Meagher County as defendants, and requested that Catlin and Jacksons be preliminarily enjoined from interfering with its access where MAR crossed their properties. Catlin filed cross-claims against Williams, alleging they misrepresented to Flying T during sales negotiations that it would have access to Section 25 over MAR.

¶12 The District Court held a four-day preliminary injunction hearing, and on August 2, 2021, issued its Findings of Fact, Conclusions of Law, and Order granting preliminary injunctive relief to Flying T (Order). The District Court concluded Flying T established prima facie cases for relief on three alternative theories: (1) MAR is an unabandoned county road; (2) MAR is an abandoned county road, but access rights are expressly reserved for area landowners, including Flying T; and (3) Flying T has an easement by estoppel over MAR. The Order enjoined Catlin and Jacksons "from inhibiting Flying T's access from U.S. Highway 89 via Moss Agate Spur Road and the Moss Agate/WSS/Road 19" during the pendency of the proceedings. The court permitted Catlin to continue locking the entrance gate on Section 15, but required that Catlin provide a key or combination to allow Flying T, Jacksons, and Williams to access MAR. Further facts are provided herein.

8

¶13    Catlin appeals, and Jacksons have filed a brief in support of Catlin's position. Meagher County and Williams have filed briefs in favor of the Order.

## STANDARDS OF REVIEW

¶14    District courts exercise discretion in deciding whether to grant or deny a preliminary injunction, and this Court will overturn a district court's decision only upon a manifest abuse of discretion. "A manifest abuse of discretion is one that is obvious, evident, or unmistakable." *BAM Ventures, LLC v. Schifferman*, 2019 MT 67, ¶ 7, 395 Mont. 160, 437 P.3d 142 (citing *Caldwell v. Sabo*, 2013 MT 240, ¶ 18, 371 Mont. 328, 308 P.3d 81) (internal quotation marks omitted).

¶15    We review a district court's factual findings for clear error. A factual finding is clearly erroneous if the finding is not supported by substantial evidence in the record, if the trial court misapprehended the effect of that evidence, or if, although there is evidence to support it, our review of the record leaves us with the definite and firm conviction that a mistake has been committed. *Soup Creek LLC v. Gibson*, 2019 MT 58, ¶ 17, 395 Mont. 105, 439 P.3d 369 (citing *McCauley v. Thompson-Nistler*, 2000 MT 215, ¶ 18, 301 Mont. 81, 10 P.3d 794). "Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion, even if weak and conflicting." *Siebken v. Voderberg*, 2015 MT 296, ¶ 12, 381 Mont. 256, 359 P.3d 1073 (citation omitted). It is "more than a mere scintilla of evidence but may be less than a preponderance of the evidence." *McGree Corp. v. Mont. PSC*, 2019 MT 75, ¶ 28, 395 Mont. 229, 438 P.3d 326 (citation and internal quotation marks omitted).

¶16 "[W]here a district court issues an injunction based on conclusions of law, we review those conclusions for correctness." *Caldwell*, ¶ 19 (citing *Sweet Grass Farms, Ltd. v. Board of County Comm'rs*, 2000 MT 147, ¶ 21, 300 Mont. 66, 2 P.3d 825) (additional citations omitted). "'In granting temporary relief by injunction, courts of equity should in no manner anticipate the ultimate determination of the questions of right involved.'" *Sweet Grass Farms*, ¶ 38 (quoting *Porter v. K&S Partnership*, 192 Mont. 175, 183, 627 P.2d 836, 840).

**DISCUSSION**

¶17 *1. Did the District Court manifestly abuse its discretion by issuing a preliminary injunction?*

¶18 A district court has discretion to issue a preliminary injunction under the following circumstances relevant to this appeal:

> (1) when it appears that the applicant is entitled to the relief demanded and the relief or any part of the relief consists in restraining the commission or continuance of the act complained of, either for a limited period or perpetually; [or]
>
> (2) when it appears that the commission or continuance of some act during the litigation would produce a great or irreparable injury to the applicant.

Section 27-19-201(1), (2), MCA. The statute's subsections are disjunctive; therefore, "[d]emonstration of one, and not all, of the subsections suffices to authorize a court to grant equitable, preliminary injunctive relief, when its discretion is so moved." *BAM Ventures*, ¶ 14; *see also Sweet Grass Farms*, ¶ 27. "[O]n proof of any grounds enumerated in § 27-19-201, MCA, a preliminary injunction should not issue absent an accompanying prima facie showing . . . ." *Davis v. Westphal*, 2017 MT 276, ¶ 24, 389 Mont. 251, 405

10

P.3d 73 (citing *Porter*, 192 Mont. at 181, 627 P.2d at 839) (additional citation omitted).

"[T]he court should decide merely whether a sufficient case has been made out to warrant the preservation of the property or rights in status quo until trial . . . . An applicant need not make out such a case as would entitle him to final judgment on the merits." *Porter*, 192 Mont. at 183, 627 P.2d at 840 (citing *Atkinson v. Roosevelt County*, 66 Mont. 411, 424, 214 P. 74, 78 (1923)) (additional citation omitted) (emphasis removed).

¶19     Catlin first argues the District Court should not have issued a preliminary injunction because Flying T could instead be made whole with monetary damages to improve the alternate routes to its property, and points to Flying T's action against First American as proof Flying T is seeking damages. We have explained, "'[m]oney damages are not considered irreparable harm, because money damages may be recovered in an action at law without resort to equity.'" *Caldwell*, ¶ 29 (quoting *American Music Co. v. Higbee*, 1998 MT 150, ¶ 15, 289 Mont. 278, 961 P.2d 109). However, our holding in *Flying T I* encompassed this issue, and we stated that "it is clear Flying T's case against Catlin is fundamentally different than its case against First American . . . . If successful, the jury would award damages to Flying T—it would not award access [across MAR]." *Flying T I*, ¶ 17. A potential monetary judgment against First American may provide damages necessary to improve an alternative route to the property, but it would "do[] nothing to determine" the equitable questions raised in Flying T's suit against Catlin and could not "furnish all the relief" to which Flying T may be entitled—access to its property over MAR. *Flying T*, ¶ 17; *Boyer v. Karagacin*, 178 Mont. 26, 31, 582 P.2d 1173, 1177 (1978).

11

¶20 Catlin next argues Flying T failed to show sufficient evidence of harm or injury to justify a preliminary injunction under § 27-19-201, MCA. Catlin offers that Flying T's members only sporadically access the property for recreational purposes and have been using alternate routes since 2017. In Catlin's view, use of MAR is not a necessity, but only a preference, and mere inconvenience is not harm.

¶21 We addressed the nature of the requisite harm under § 27-19-201, MCA, in *BAM Ventures*, explaining that, while only subsection (2) of § 27-19-201, MCA, explicitly refers to an applicant's injury, "all requests for preliminary injunctive relief require some demonstration of threatened harm or injury, whether under the 'great or irreparable injury' standard of subsection (2), or the lesser degree of harm implied within the other subsections of § 27-19-201, MCA." Under subsection (1), "when it appears an applicant has established entitlement to relief under a legal claim that consists of 'restraining the commission or continuance of [an] act,' injunctive relief is authorized to stop the continuing illegal act, as well as the harm that is implicitly being done thereby." *BAM Ventures*, ¶ 16 (quoting § 27-19-201(1), (2), MCA).

¶22 In *BAM Ventures*, the Schiffermans sought a preliminary injunction to bar an adjacent property owner from restricting access to their property, pending the outcome of the litigation, via a route the Schiffermans had utilized for years and to which the Schiffermans alleged a right to access by prescriptive easement. *BAM Ventures*, ¶ 4. In response to their neighbor blocking access to the original route, the Schiffermans began driving across an unimproved grass and dirt area to access their property. They attempted

12

to improve this alternate route, but "it did not provide comparable access." *BAM Ventures*, ¶ 3. Although the district court found the Schiffermans had not established "great or irreparable injury" under § 27-19-201(2), MCA, we nonetheless affirmed the issuance of the preliminary injunction under § 27-19-201(1), MCA, because the Schiffermans had made a prima facie showing of prescriptive easement and "established they would suffer continuing harm by not being able to access their property, while litigation was pending, by way of the access route they had used for many years." *BAM Ventures*, ¶ 18.

¶23    Similarly, here the District Court found that "Flying T lacks access comparable to that it enjoyed for years before this dispute arose." This finding was supported by testimony from Timbrook and Bert and Debra Williams about the legal and physical accessibility difficulties presented by alternate routes to the property. Timbrook solicited bids from contractors to upgrade an alternate road, and learned it "requires significant improvements in excess of $350,000 to be passable and even close to the quality of [MAR]." Flying T had to cancel plans to make improvements to its property because of an inability to transport machinery and materials over the alternate routes. Thus, the District Court's finding is not clearly erroneous. As in *BAM Ventures*, while there is an alternate route that technically provides physical access to its property, Flying T sufficiently demonstrated that it is suffering, and would continue to suffer during the litigation, harm or injury by being restricted from the route it had used for several years prior to the current conflict, and by which necessary vehicles could reach the property.

13

¶24 The District Court concluded that Flying T demonstrated prima facie claims for relief on three theories. Regarding Flying T's claim that MAR is an unabandoned county road, the District Court found that "the 1892 Petition, accepted and approved by the Meagher County Commission, following public notice and the appointment of viewers, as reflected in the County records, constitutes prim[a] facie evidence of the creation of a county road." Flying T's expert Dr. Larry Lahren testified his review of the historical records indicated the original White Sulphur Springs to Livingston Road was created in 1882 and roughly followed the route of the current Highway 89 (1882 Road). In 1891, locals petitioned Meagher County to shift a portion of the road eastward. Flying T presented a copy of the County Commissioner's Journal showing the petitioners requested the new road begin "20 rods south of Catlin Spring" and terminate at an intersection with the original road "at or near the stage station about two miles above what is known as the 'Hill Ranche.'" Flying T submitted the official road record showing the commissioners appointed road viewers and ultimately accepted the changes as recommended by the petitioners on September 10, 1892, therein creating the new 1892 White Sulphur Springs to Livingston Road (1892 Road). At the hearing, the parties primarily disputed whether the 1892 Road terminated by intersecting with the original 1882 Road in Section 15 near the current entrance to MAR, or in Section 23. In support of its position that the historic stage station, referenced in the road record as the ending point of the created 1892 Road, was located in Section 15, Flying T presented depositions and declarations from individuals who lived in the area and used MAR from the 1920s-1960s, as well as state and federal

14

government maps depicting Moss Agate Spur as a county road leading to the historical stage station in Section 15. Catlin's expert, surveyor Bernard Hallin, acknowledged he had no evidence the stage station was located elsewhere, but he disputed the 1892 Road ever passed through Section 15, instead testifying it intersected with the original 1882 Road in Section 23. Multiple maps, including one accompanying the road record, do not depict the stage station at all, and instead show the Road proceeding as described by Hallin.

¶25 The standard for determining the existence of a public road is whether "'the record taken as a whole shows that a public road was created.'" *Letica Land Co., LLC v. Anaconda-Deer Lodge Cnty.*, 2015 MT 323, ¶ 15, 381 Mont. 389, 362 P.3d 614 (quoting *Reid v. Park Cnty.*, 192 Mont. 231, 236, 627 P.2d 1210, 1213 (1981)). Strict proof of compliance with statutory procedures is not required "where the applicable documentation might be over 100 years old due to the potential burden on the public to produce the jurisdictional record." *Letica Land Co.*, ¶ 19 (citing *Reid*, 192 Mont. at 236, 627 P.2d at 1213). The entries in the Commissioners' Journal and the road record are prima facie evidence showing the 1892 Road ended "at or near the stage station." *See* § 26-1-605, MCA ("Entries in public or other official books or records made in the performance of the officer's duty by a public officer of this state . . . are prima facie evidence of the facts stated in the book or record."); *see also* § 26-1-606, MCA. A district court may also rely on testimony from residents with historical knowledge of the disputed road. *See Galassi v. Lincoln County Bd. of Comm'rs*, 2003 MT 319, ¶¶ 10, 17, 18, 318 Mont. 288, 80 P.3d 84

15

(relying in part on testimony from past residents about the historical use and location of disputed road).

¶26 Regarding the related issue of whether MAR was ever abandoned by the county, the District Court considered as evidence a 1969 petition to abandon a portion the 1892 Road. Once created, a county road cannot be abandoned by anything short of operation of law, a court order, or upon the order of the commissioners. *Soup Creek LLC*, ¶¶ 25, 32; § 7-14-2615, MCA. The county "must take affirmative steps to indicate intention to abandon such road." *Galassi*, ¶ 15 (citing *McCauley*, ¶ 31). Dr. Lahren testified he found "no evidence that the '69 abandonment petition was posted . . . nor did we find any evidence that the commissioners approved the abandonment." Hallin disagreed and concluded the records showed abandonment, although he admitted he could not locate a separate resolution by the commissioners. The District Court concluded that Catlin "failed to produce evidence of any act demonstrating a 'decisive and conclusive intent' to abandon Moss Agate as a county road and there is no evidence of an Order of the Board to that end." Given the evidence presented and the affirmative showing required to demonstrate abandonment, the District Court's finding is not clearly erroneous.

¶27 Consequently, although Catlin presented conflicting evidence, the District Court's findings regarding establishment and location of the 1892 Road, and that it had not been abandoned, were supported by substantial evidence and thus not clearly erroneous for this purpose, and demonstrate Flying T presented sufficient evidence to make out a prima facie case that the portion of MAR running though Section 15 is an unabandoned county road

16

for purposes of preliminary injunctive relief. *Soup Creek LLC*, ¶ 17; *Siebken*, ¶ 12; *McGree Corp.*, ¶ 28. This determination may or may not be ultimately sustained in the litigation.[3]

¶28 Catlin argues that, even if Flying T otherwise qualified for a preliminary injunction, the District Court erred by ruling that the status quo was "established by Flying T's use of the access for approximately three years before this litigation commenced." The "status quo" is "'the last actual, peaceable, noncontested condition which preceded the pending controversy.'" *Sweet Grass Farms*, ¶ 28 (quoting *Porter*, 192 Mont. at 181, 627 P.2d at 839). Catlin contends the status quo to be preserved should be the period between its locking of the gate in September 2017 and the filing of this suit by Flying T against Catlin in May 2019. Catlin argues that, during this period, the use of MAR was uncontested and peaceful between the parties, as Flying T was using alternate routes to reach its property.

¶29 Flying T began using MAR in 2013 to view the property in Section 25 prior to its purchase in 2014. After its purchase, Flying T members accessed the property by exiting Highway 89 and entering MAR through the unlocked gate on Catlin's property in Section 15. Flying T's contractors used this route to haul building materials and move heavy machinery to Section 25. The lead contractor testified that, until 2017, he exclusively used MAR while working on the property, Flying T had made significant improvements to MAR

---

[3] Because we conclude the District Court did not err by concluding Flying T had made out a prima facie claim that MAR was an unabandoned county road over Section 15, we do not consider whether the District Court erred by determining Flying T also established prima facie claims on the theory of easement by estoppel, or on the theory that, if MAR was abandoned, access over the road was reserved for area property owners. These theories may be further tested in the proceeding.

at its own expense, the gate was not locked, and that he did not ask Catlin's permission. Multiple subcontractors submitted declarations confirming the same. Horses were delivered to Flying T's property over this route. Catlin was aware of Flying T's use of MAR during this time and did not openly dispute its access except on the brief occasion in June 2014, and reopened access to Flying T following a conversation with the sheriff's deputy, who had received a document from First American. Thus, Flying T enjoyed largely unfettered access to MAR between 2014 and September 2017. *See Flying T I*, ¶ 4 ("In September 2014, propane was delivered to Flying T's cabin and the members of Flying T began to use the property for archery hunting. For the next three years, Flying T accessed the property via Moss Agate without interruption or hindrance.").

¶30 Catlin locked the gate at the entrance to MAR in September 2017. Flying T cut Catlin's lock, but Catlin replaced it and refused further access, over Flying T's objection. Catlin's actions in Fall 2017, regardless of legal justification, triggered the current controversy. *See Sweet Grass Farms*, ¶ 28. Within a month, Flying T submitted its claim to First American and attempted to negotiate a solution. When that failed, Flying T filed actions against First American and against Catlin in 2019. Thus, we agree with the District Court that the time between Catlin locking the gate in 2017 and Flying T commencing litigation in 2019 was not peaceable, but disputed, and was not the status quo period. Rather, Flying T's peaceable use of MAR from 2014-2017 was the status quo.

18

¶31 *2. Did the District Court err by granting preliminary injunctive relief to parties in addition to Flying T?*

¶32 Catlin disputes the scope of the District Court's Order, which permits Catlin to continue locking the gate at the entrance to MAR on Section 15 "on the condition that Flying T, Williams and Jacksons have a key or the combination to pass through the gate and travel over the road, as needed." Neither Jacksons, who opposed access by Flying T, nor Williams joined in Flying T's motion for preliminary injunction, nor filed separate motions seeking relief. Catlin argues it did not receive notice the court may grant access to additional parties, and was therefore deprived of due process.

¶33 Due process requirements are "flexible and may be adapted to meet the procedural protections demanded by a specific situation. Accordingly, 'the process due in any given case varies according to the factual circumstances of the case [and] the nature of the interests at stake.'" *Geil v. Missoula Irrigation Dist.*, 2002 MT 269, ¶ 58, 312 Mont. 320, 59 P.3d 398 (citing and quoting *McDermott v. McDonald*, 2001 MT 89, ¶ 10, 305 Mont. 166, 24 P.3d 200) (internal citation omitted). The purpose of preliminary injunctive relief specifically is to preserve the status quo and "minimize the harm to all parties pending full trial." *Yockey v. Kearns Props., LLC*, 2005 MT 27, ¶ 18, 326 Mont. 28, 106 P.3d 1185; *see also Porter*, 192 Mont. at 182, 627 P.2d at 840; *Atkinson*, 66 Mont. at 423, 214 P. at 77. In that regard, we have explained:

> Courts sitting in equity are empowered to determine all the questions involved in the case and to do complete justice; this includes the power to fashion an equitable result. An equity court whose jurisdiction has been invoked for an equitable purpose, will proceed to determine any other

19

equities existing between the parties connected with the main subject of the suit, and grant all relief necessary to the entire adjustment of the subject.

*Trs. of Washington-Idaho-Montana Carpenters-Employers Ret. Trust Fund v. Galleria P'ship*, 239 Mont. 250, 265, 780 P.2d 608, 617 (1989) (citations omitted).

¶34 Bert Williams testified at the hearing and explained that the route from his home to the other side of his ranch cannot support horse trailers and ranch equipment, and thus he uses MAR four or five times a summer as needed. Historically, Williams and their lessees used MAR to access Williams' property, including Section 25, without permission from Catlin or Jacksons. Bert first encountered a locked entry gate in September 2017. Catlin initially provided him with a key but asked for it back approximately a month later. Bert stated that, at the time of the hearing, he believed he was still locked out of MAR. Ben Galt, general partner of Catlin, testified he had denied access to both Williams and Jacksons on at least one occasion since 2017. Scott Jackson testified at the hearing and explained his family used MAR to access their property about four times a year before the controversy started, but contacted Catlin as a courtesy. Before the lawsuit, Scott believed area landowners had the right to use MAR, including Moss Agate Spur, to access their properties.

¶35 Jacksons and Williams are parties to this action, own property accessible by MAR, testified at the hearing, have had interactions with Catlin, and have historically used MAR without the necessity of obtaining prior permission from Catlin. One of Flying T's claims in the litigation is that MAR is an abandoned county road with reserved access rights to area property owners. Catlin was on notice that Flying T was seeking this relief for area

20

landowners, even though Jacksons and Williams had not formally requested a preliminary injunction. Under the "factual circumstances of the case," *Geil*, ¶ 58, we cannot conclude the District Court violated Catlin's due process rights by including these parties within the injunctive relief pending the final outcome of the proceeding. The District Court, sitting in equity, had the ability to "determine any other equities existing between the parties connected with the main subject of the suit"—the legal status of MAR for purposes of its use by these parties. *Trs.*, 239 Mont. at 265, 780 P.2d at 617.

¶36 Catlin argues the District Court "also granted access to Meagher County, and thereby the public in general, when it stated MAR is a county road and has not been abandoned." Jacksons make the same argument regarding their property in Section 2. However, the Order's language implicitly precludes public access by requiring Catlin to provide access through the locked gate only to Flying T, Williams, and Jacksons. The Order preserves the status quo of MAR's use by those parties, and does not provide for public access to MAR. The District Court thus minimized harm to "all parties," including Catlin, by ordering the gate to otherwise remain locked. *Yockey*, ¶ 18.

¶37 *3. Did the District Court err by prematurely ruling on the merits of the case?*

¶38 Catlin and Jacksons argue that some findings and conclusions in the Order went beyond the appropriate inquiry for a preliminary injunction. "In determining the merits of a preliminary injunction, it is not the province of either the District Court or this Court on

appeal to determine finally matters that may arise upon a trial on the merits." *Yockey*, ¶ 18 (citing *Sweet Grass Farms*, ¶ 38); *see also Porter*, 192 Mont. at 183, 627 P.2d at 840.

¶39 While the District Court correctly noted it was not "expressing a final opinion" as to Flying T's claims, we agree it made some conclusive factual and legal statements on issues that, by themselves, could appear to be final determinations, including statements such as: (1) "the road was established on September 10, 1892"; (2) "the stage station was locat[ed] in Section 15"; (3) "the road was not abandoned"; (4) "Flying T, the Dupeas, and others were expressly reserved the right of access over the abandoned Road, as well as Moss Agate"; and (5) MAR "is the only feasible access" to Flying T's property. To clarify, these statements, and any other issues beyond which is necessary to preserve the status quo, are reserved for a trial on the merits, subject to testing and to resolution under the proper standard of proof. Here, we only conclude that, at this stage of the litigation, the District Court did not obviously, evidently, or unmistakably abuse its discretion by granting preliminary injunctive relief. *BAM Ventures*, ¶ 7.

¶40 Affirmed.

/S/ JIM RICE

We concur:

/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON