FILED

09/21/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0172

DA 22-0172

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 184

MONTANA DEMOCRATIC PARTY and MITCH BOHN; and
WESTERN NATIVE VOICE, MONTANA NATIVE VOTE,
BLACKFEET NATION, CONFEDERATED SALISH AND
KOOTENAI TRIBES, FORT BELKNAP INDIAN COMMUNITY,
and NORTHERN CHEYENNE TRIBE; and MONTANA YOUTH
ACTION, FORWARD MONTANA FOUNDATION,
and MONTANA PUBLIC INTEREST RESEARCH GROUP,

        Plaintiffs and Appellees,

   v.

CHRISTI JACOBSEN, in her official capacity
as Montana Secretary of State,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 21-0451
Honorable Michael G. Moses, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

          Dale Schowengerdt, John M. Semmens, Crowley Fleck PLLP, Helena,
Montana

          Leonard H. Smith, David F. Knobel, Crowley Fleck PLLP, Billings,
Montana

          Ian McIntosh, William McIntosh Morris, E. Lars Phillips, Crowley Fleck
PLLP, Bozeman, Montana

          Austin Knudsen, Montana Attorney General, David M.S. Dewhirst,
Solicitor General, Kathleen Lynn Smithgall, Assistant Solicitor General,
Helena, Montana

          Austin Markus James, Chief Legal Counsel, Office of the Secretary of State,
Helena, Montana

For Appellees Montana Democratic Party and Mitch Bohn:

Matthew P. Gordon, Perkins Coie LLP, Seattle, Washington

Peter Michael Meloy, Meloy Law Firm, Helena, Montana

John C. Heenan, Heenan & Cook PLLC, Billings, Montana

Henry J. Brewster, Jonathan P. Hawley, Elias Law Group LLP, Washington, District of Columbia

For Appellees Montana Youth Action, Forward Montana Foundation, and Montana Public Interest Research Group:

Rylee Sommers-Flanagan, Upper Seven Law, Helena, Montana

Ryan Aikin, Aikin Law Office, PLLC, Missoula, Montana

For Appellees Western Native Voice, Montana Native Vote, Blackfeet Nation, Confederated Salish and Kootenai Tribes, Fort Belknap Indian Community, and Northern Cheyenne Tribe:

Alex Rate, Akilah Lane, ACLU of Montana, Missoula, Montana

Alora Thomas-Lundborg, Jonathan Topaz, Dale Ho, ACLU, New York, New York

Samantha Kelty, Native American Rights Fund, Washington, District of Columbia

Jacqueline De Leon, Matthew Campbell, Native American Rights Fund, Boulder, Colorado

Theresa J. Lee, Election Law Clinic, Harvard Law School, Cambridge, Massachusetts

For Amicus Restoring Integrity & Trust in Elections:

Rob Cameron, Jackson, Murdo & Grant, P.C., Helena, Montana

Brett W. Johnson, Tracy A. Olson, Law Office of Snell & Wilmer, Phoenix, Arizona

Submitted on Briefs: July 13, 2022
Decided: September 21, 2022

Filed:

_____
Clerk

2

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Montana Secretary of State Christi Jacobsen appeals from the preliminary injunction entered by the Thirteenth Judicial District Court, Yellowstone County, prohibiting her from enforcing two election laws enacted during the 2021 Montana Legislative Session, pending final resolution of constitutional challenges brought by Plaintiffs and Appellees. Senate Bill 169 (SB 169) modified voter registration requirements by eliminating student identification as a sufficient form of identification for voting purposes without additional supporting documentation, and House Bill 176 (HB 176) eliminated Election Day Registration (EDR) by moving the deadline to register to vote during late registration to noon the day before the election.

¶2 The following issue is raised:

*Did the District Court manifestly abuse its discretion in preliminarily enjoining Senate Bill 169 and House Bill 176?*

¶3 Applying our settled standards for review of preliminary injunctions, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 During the 2021 Montana Legislative Session, the Legislature passed House Bill 176, House Bill 530, Senate Bill 169, and House Bill 506. The Governor signed these bills into law in April 2021. Plaintiffs and Appellees Montana Democratic Party and Mitch Bohn (MDP), Western Native Voice, Montana Native Vote, Blackfeet Nation, Confederated Salish and Kootenai Tribes, Fort Belknap Indian Community, and Northern Cheyenne Tribe (WNV), and Montana Youth Action, Forward Montana Foundation, and Montana Public Interest Research Group (MYA), (collectively "Appellees"), initiated

3

individual legal challenges to these four election laws in the district courts asserting state constitutional violations, and sought preliminary injunctive relief to enjoin the Secretary from enforcing the laws pending a trial on the merits.[1]  This appeal involves only HB 176 and SB 169.

¶5      Montana law has required voters to present some form of voter identification for in-person participation in state elections since 2003.  Section 13-13-114(1)(a), MCA (2003).  Prior to enactment of SB 169, 2021 Mont. Laws ch. 254, § 2, Montanans could demonstrate their identity at the polls by presenting either a photo identification, "including but not limited to a valid driver's license, a school district or postsecondary education photo identification, or a tribal photo identification," or "a current utility bill, bank statement, paycheck, notice of confirmation of voter registration . . . government check, or other government document that shows the [voter's] name and current address."  Section 13-13-114(1)(a), MCA (2019).  Under SB 169, voter identification is bifurcated into two forms of identification.  Primary[2] forms of identification are: "a Montana driver's license, Montana state identification card . . . military identification card, tribal photo identification card, United States passport, or Montana concealed carry permit."[3]  Section

_____

[1] All Appellees sought to enjoin House Bill 176, MDP and WNV sought to enjoin House Bill 530, MDP and MYA sought to enjoin Senate Bill 169, and MYA sought to enjoin House Bill 506.

[2] The terms "primary" and "non-primary" are not used in the statute but are used in the Secretary's briefing to describe the two categories of identification documentation, and we use these references for purposes of this Opinion.

[3] As recently explained by the Secretary's office, SB 169 "do[es] not address proof of citizenship"; rather, the "existing voter registration process . . . require[s] applicants to attest to their U.S.

4

13-13-114(1)(a)(i), MCA.[4]  Primary forms of identification are sufficient by themselves to establish identity—if an individual presents a primary form of identification, no further documentation is required to receive a regular ballot to vote.  Section 13-13-114(1)(b), MCA.[5]

¶6      To use a photo ID that does not appear on the list of primary forms of identification, now including student ID cards, a voter must also present "a current utility bill, bank statement, paycheck, government check, or other government document" showing the voter's name and current address.  Section 13-13-114(1)(a)(ii)(A), MCA. *See* § 13-13-114(1)(a)(ii)(B), MCA (secondary forms of identification that may not be used on a stand-alone basis include "photo identification that shows the [voter's] name, including but not limited to a school district or postsecondary education photo identification").  SB 169 includes a process by which voters unable to comply with ID requirements may cast a provisional ballot if they can present an identification document[6]

---

citizenship and Montana residency under the penalty of perjury."  Mont. Sec'y of State, Notice of Amendment, at 170, Jan. 18, 2022, *available at* https://sosmt.gov/arm/register/.

[4] If no year is identified, the citation refers to the 2021 version of the statute.

[5] SB 169 eliminated the requirement under former law that these primary forms of identification be "current" or "valid," permitting a voter to use an expired form of primary identification. *See* S. 169, 2021 Leg., 67th Reg. Sess. § 2 (Mont. 2021).

[6] Defined as a "current utility bill, bank statement, paycheck, government check, or other government document that shows the elector's name and current address."  Section 13-15-107(3)(a), MCA.

5

and execute a declaration stating the voter has a qualifying "reasonable impediment to meeting the identification requirements." Section 13-15-107(3)(a), MCA.[7]

¶7 A primary effect of SB 169 is that student ID cards, presented alone, are no longer sufficient to establish identification for participation in state elections. Instead, voters wishing to use a student ID must also present an additional identification document as defined in § 13-13-114(1)(a)(ii)(A), MCA, to establish identification.

¶8 As to HB 176, Election Day Registration was adopted in Montana in 2005. Section 13-2-304(1)(a), MCA (2005). EDR enabled Montana voters to both register to vote and cast a ballot on election day. Section 13-2-304(1)(a), MCA (2005) ("An elector may register or change the elector's voter registration information after the close of regular registration . . . and vote in the election if the election administrator . . . receives and verifies the elector's voter registration information prior to the close of the polls on election day."). HB 176 eliminated EDR, moving the deadline for late registration from election day to noon the day before the election. Section 13-2-304(1)(a), MCA (2021 Mont. Laws ch. 244, § 2).

¶9 The District Court consolidated the cases and, after conducting a hearing on March 10, 2022, issued its Findings of Fact, Conclusions of Law, and Order ("Order") granting a preliminary injunction that "restrained and prohibited" the Secretary from enforcing the

---

[7] Qualifying "reasonable impediment[s]" are: "(i) lack of transportation; (ii) lack of birth certificate or other documents needed to obtain identification; (iii) work schedule; (iv) lost or stolen identification; (v) disability or illness; (vi) family responsibilities; or (vii) photo identification has been applied for but not received." Section 13-15-107(4), MCA.

6

challenged laws, pending the resolution of Appellees' request for a permanent injunction. The District Court applied strict scrutiny review in concluding Appellees made out prima facie cases that the laws at issue in this appeal, Section 2 of SB 169 and the entirety of HB 176, unconstitutionally burdened Appellees' fundamental right to vote and right to equal protection. The court further concluded Appellees would suffer irreparable harm through the loss of constitutional rights if SB 169 and HB 176 remained in effect during the pendency of the litigation.

¶10   The Secretary appealed the preliminary injunction and moved the District Court for a stay of the Order under M. R. App. P. 22(1), which the court denied. She then moved this Court for a stay under Rule 22(2)(a) pending appeal of the preliminary injunction, which this Court granted. *Mont. Democratic Party v. Jacobsen*, No. DA 22-0172, Order (May 17, 2022). The Secretary appeals the District Court's Order only with regard to HB 176 and Section 2 of SB 169.

**STANDARDS OF REVIEW**

¶11   We review a district court's grant or denial of a preliminary injunction for a manifest abuse of discretion. *Driscoll v. Stapleton*, 2020 MT 247, ¶ 12, 401 Mont. 405, 473 P.3d 386 (citing *Davis v. Westphal*, 2017 MT 276, ¶ 10, 389 Mont. 251, 405 P.3d 73). A manifest abuse of discretion is one that is "'obvious, evident, or unmistakable.'" *Driscoll*, ¶ 12 (quoting *Weems v. State*, 2019 MT 98, ¶ 7, 395 Mont. 350, 440 P.3d 4). *See also In re Guardianship & Conservatorship of A.M.M.*, 2016 MT 213, ¶ 10, 384 Mont. 413, 380 P.3d 736 ("A district court has broad discretion to grant or deny a preliminary injunction[.]");

7

*Planned Parenthood of Mont. v. State*, 2022 MT 157, ¶ 5, 409 Mont. 378, ___ P.3d ___ ("A court abuses its discretion when it acts 'arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice.'" (citation omitted)). We review legal conclusions de novo to determine whether they are correct. *Mont. Cannabis Indus. Ass'n v. State*, 2012 MT 201, ¶ 12, 366 Mont. 224, 286 P.3d 1161 (*MCIA I*) (citation omitted); *Planned Parenthood of Mont.*, ¶ 5 (citing *Driscoll*, ¶ 12). Findings of fact are entitled to "great deference" and reviewed only for clear error, characterized by an absence of support by substantial evidence, a misapprehension of the effect of the evidence, or a review of the record that leaves this Court with the "definite and firm conviction that a mistake has been" made. *In re A.M.M.*, ¶ 10; *Skelton Ranch, Inc. v. Pondera Cnty. Canal & Reservoir Co.*, 2014 MT 167, ¶ 27, 375 Mont. 327, 328 P.3d 644; *Cole v. St. James Healthcare*, 2008 MT 453, ¶¶ 9, 22, 348 Mont. 68, 199 P.3d 810.

## DISCUSSION

¶12     *Issue: Did the District Court manifestly abuse its discretion in preliminarily enjoining Senate Bill 169 and House Bill 176?*

¶13     At the outset we emphasize the narrow scope of this Opinion, reflecting application of the standards of review and our precedent governing appellate review of preliminary injunctions. In this appeal from a portion of the District Court's Order granting a preliminary injunction, we do not address the ultimate merits of the claims that are to be resolved at trial. *Planned Parenthood of Mont.*, ¶ 20; *BAM Ventures, LLC v. Schifferman*, 2019 MT 67, ¶ 7, 395 Mont. 160, 437 P.3d 142 (citing *Caldwell v. Sabo*, 2013 MT 240,

8

¶ 19, 371 Mont. 328, 308 P.3d 81). *See also Benefis Healthcare v. Great Falls Clinic, LLP*, 2006 MT 254, ¶ 19, 334 Mont. 86, 146 P.3d 714 ("[O]ur analysis below is not intended to express and does not express any opinion about the ultimate merits of the individual issues or of the case . . . . Our task is not to resolve the substantive matters of law . . . it is to inquire whether the [d]istrict [c]ourt manifestly abused its discretion."). "In determining the merits of a preliminary injunction, 'it is not the province of either the [d]istrict [c]ourt or Supreme Court on appeal to determine finally matters that may arise upon a trial on the merits.'" *Sweet Grass Farms, Ltd. v. Bd. of Cnty. Comm'rs*, 2000 MT 147, ¶ 39, 300 Mont. 66, 2 P.3d 825 (quoting *Dreyer v. Bd. of Trustees*, 193 Mont. 95, 100, 630 P.2d 229 (1981)). "In granting temporary relief by injunction, courts of equity should in no manner anticipate the ultimate determination of the questions of right involved." *Sweet Grass Farms*, ¶ 38.

Preliminary Injunction Standard

¶14     Section 27-19-201, MCA, grants a district court discretion to issue a preliminary injunction under any one of five different subsections. *BAM Ventures*, ¶ 14. Here, the District Court granted preliminary injunctive relief to Appellees under subsections (1) and (2), which provide a district court may grant a preliminary injunction:

> (1) when it appears that the applicant is entitled to the relief demanded and the relief or any part of the relief consists in restraining the commission or continuance of the act complained of, either for a limited period or perpetually; [or]
>
> (2) when it appears that the commission or continuance of some act during the litigation would produce a great or irreparable injury to the applicant[.]

Section 27-19-201(1), (2), MCA.

9

¶15 We have held that the statute requires applicants for preliminary injunctive relief to demonstrate, under subsection (1), "a prima facie case that they will suffer some degree of harm and are entitled to relief," or under subsection (2), "a prima facie case that they will suffer an 'irreparable injury.'" *Driscoll*, ¶ 17; *Planned Parenthood of Mont.*, ¶ 30.[8] The loss of a constitutional right constitutes harm or irreparable injury for the purposes of issuing a preliminary injunction. *Driscoll*, ¶ 15 (citing *MCIA I*, ¶ 15); *Planned Parenthood of Mont.*, ¶ 60 (recognizing irreparable injury from interference with a constitutional right justified a preliminary injunction).[9]

---

[8] The Secretary asserts that the District Court was also required to consider the public interest before granting the preliminary injunction, citing to a passage in *Four Rivers Seed Co. v. Circle K Farms*: "The court has a duty to balance the equities and minimize potential damage when considering an application for a preliminary injunction." 2000 MT 360, ¶ 12, 303 Mont. 342, 16 P.3d 342 (citation omitted). This "balanc[ing of] the equities" approach does not appear anywhere in the preliminary injunction statute, § 27-19-201, MCA, and has only rarely appeared in modern Montana caselaw. *See Four Rivers Seed Co.*, ¶ 12 (citing *Porter v. K & S P'ship*, 192 Mont. 175, 180, 627 P.2d 836, 839 (1981)); *Valley Christian Sch. v. Mont. High Sch. Ass'n*, 2004 MT 41, ¶ 18, 320 Mont. 81, 86 P.3d 554 (Nelson, J., dissenting) ("[T]he court should balance the equities and minimize the damage that could befall the moving party if the status quo is not preserved pending the resolution of the underlying action.") (citing *Porter*, 192 Mont. at 182, 627 P.2d at 840). Regardless, the District Court did in fact address the Secretary's argument that it would be harmed by a preliminary injunction because staff have already taken steps to implement the law, as the court found it "not . . . persuasive that the Secretary has been taking steps to enact these laws given that is a duty of her job and she has had notice that these laws were contested since before they were signed into law as evidenced in the testimony that occurred in hearings at the legislature and notice soon after they were enacted as evidenced by the [Appellees'] filing of their complaints."

[9] The Secretary claims that the District Court failed to require the Appellees to prove irreparable harm under § 27-19-201, MCA. The District Court correctly concluded as a matter of law that a loss of a constitutional right constitutes sufficient harm for purposes of a preliminary injunction under § 27-19-201, MCA, and properly proceeded to analyze whether such a right had been lost.

¶16    We have repeatedly "explained and interpreted" this statutory standard. *Planned Parenthood of Mont.*, ¶ 37. "Prima facie" means "at first sight" or "on first appearance but subject to further evidence or information." *Driscoll*, ¶ 15 (citation omitted; internal quotation omitted). *See also Planned Parenthood of Mont.*, ¶ 25; *Prima facie*, *Black's Law Dictionary* (11th ed. 2019) ("*prima facia*, *adj.* (18c) Sufficient to establish a fact or raise a presumption unless disproved or rebutted; based on what seems to be true on first examination, even though it may later be proved to be untrue."). An applicant for a preliminary injunction need *not* "establish 'entitlement to final judgment,' 'relief at all events on final hearing,' 'relief at a trial on the merits,' or 'evidence . . . sufficient to prevail at trial.'"[10] *Planned Parenthood of Mont.*, ¶ 30 (citing *Driscoll*, ¶ 16; *Weems*, ¶ 18; *Mack v. Anderson*, 2016 MT 204, ¶ 15, 384 Mont. 368, 380 P.3d 730; *M.H. v. Mont. High Sch. Ass'n*, 280 Mont. 123, 136, 929 P.2d 239, 247 (1996); *Porter v. K & S P'ship*, 192 Mont. 175, 183, 627 P.2d 836, 840 (1981); *Atkinson v. Roosevelt Cnty.*, 66 Mont. 411, 422, 214 P. 74, 77 (1923); *Parsons v. Mussigbrod*, 59 Mont. 336, 341, 196 P. 528, 529 (1921); *Rea Bros. Sheep Co. v. Rudi*, 46 Mont. 149, 159, 127 P. 85, 87 (1912); *Maloney v. King*, 25 Mont. 188, 192-93, 64 P. 351, 352 (1901)).

---

[10] The Secretary faults the District Court for failing to evaluate Appellees' likelihood of succeeding on the merits. In *Planned Parenthood of Montana*, we analyzed our preliminary injunction standard at length, concluding that a preliminary injunction under § 27-19-201(1), (2), MCA, requires only a prima facie showing. *Planned Parenthood of Mont.*, ¶¶ 21-37. We "fail[ed] to see a meaningful difference between" "prima facie" and the "likelihood of success" formulation that the Secretary urges we adopt here. *Planned Parenthood of Mont.*, ¶ 36.

¶17 While a statute is generally afforded a presumption of constitutionality, it is not afforded greater protection from a preliminary injunction. *Planned Parenthood of Mont.*, ¶ 33 ("A statute enjoys a presumption of constitutionality," but "[b]ecause a preliminary injunction does not decide the ultimate merits of a case, [] a party need establish only a prima facie violation of its rights to be entitled to a preliminary injunction—even if such evidence ultimately may not be sufficient to prevail at trial." (quoting *Driscoll*, ¶ 16) (internal quotation marks omitted)). In other words, a statute's presumption of constitutionality "does not alter the movant's burden to present a prima facie case at the preliminary injunction stage." *Planned Parenthood of Mont.*, ¶¶ 27, 33 (applicants are not "required to prove that the challenged laws are unconstitutional" at the preliminary injunction stage).[11]

Level of Scrutiny

¶18 The Secretary challenges the District Court's use of strict scrutiny—requiring the government to show that the challenged law is narrowly tailored to serve a compelling government interest—to determine whether the Appellees made a prima facie case for SB

---

[11] The Secretary argues that the District Court was required to implement a higher standard for the preliminary injunction at issue because the injunction will require her to affirmatively undo steps that she has already taken to implement the challenged laws and thereby constitutes a "mandatory," rather than "prohibitory," preliminary injunction. The District Court noted that the Secretary would not be forced to undo prior elections, only to refrain from conducting future elections in a manner different from how elections were conducted prior to the enactment of the challenged laws, and found that the Secretary had proceeded under the full knowledge that SB 169 was subject to constitutional challenge. Regardless, as the District Court held, "'the principles upon which mandatory and prohibitory injunctions are granted do not materially differ.'" *City of Whitefish v. Troy Town Pump*, 2001 MT 58, ¶ 21, 304 Mont. 346, 21 P.3d 1026 (citation omitted; internal quotations omitted). Moreover, the District Court correctly found that the result would be the same even if a higher standard were applied. The District Court did not err in this matter.

12

169's and HB 176's unconstitutionality.[12] To determine whether an applicant has demonstrated a constitutional injury, "a court may determine with which level of scrutiny to evaluate the challenged statute": strict scrutiny, middle-tier scrutiny, or the rational basis test. *Driscoll*, ¶ 18; *see also MCIA I*, ¶ 16. Strict scrutiny is the most stringent level of scrutiny and is applied to a statute that implicates, infringes on, or interferes with a fundamental right. *See Driscoll*, ¶ 18; *MCIA I*, ¶ 16 ("Legislation that implicates a fundamental constitutional right is evaluated under a strict scrutiny standard, whereby the government must show that the law is narrowly tailored to serve a compelling government interest.") (citation omitted); *Wadsworth v. State*, 275 Mont. 287, 302, 911 P.2d 1165, 1174 (1996) ("The most stringent standard, strict scrutiny, is imposed when the action complained of interferes with the exercise of a fundamental right or discriminates against a suspect class." (citations omitted)); *Mont. Env't Info. Ctr. v. Dep't of Env't Quality*, 1999 MT 248, ¶ 63, 296 Mont. 207, 988 P.2d 1236 (right at issue "is a fundamental right because it is guaranteed by the Declaration of Rights found at Article II, Section 3 of Montana's Constitution, and . . . any statute or rule which implicates that right must be strictly scrutinized[.]"). A right is fundamental if it is found in the Montana Constitution's Declaration of Rights. *See generally* Mont. Const. art. II.

¶19     As a right included in the Montana Constitution's Article II Declaration of Rights, the right to vote is fundamental. *See* Mont. Const. art. II, § 13 ("All elections shall be free and open, and no power, civil or military, shall at any time interfere to prevent the free

---

[12] The Secretary does not argue that SB 169 or HB 176 could survive strict scrutiny.

exercise of the right of suffrage."); *Mont. Env't Info. Ctr.*, ¶ 63 (right at issue "is a fundamental right because it is guaranteed by the Declaration of Rights"). *Cf. Butte Cmty. Union v. Lewis*, 219 Mont. 426, 430-31, 712 P.2d 1309, 1311-12 (1986) (denying a right status as a "fundamental right" due to its omission from Article II). Further, "[s]uffrage is the basic right without which all others are meaningless."[13] It is perhaps the most foundational of our Article II rights and stands, undeniably, as the pillar of our participatory democracy. "If we are to have a true participatory democracy, we must ensure that as many people as possible vote for the people who represent them. . . ." Montana Constitutional Convention, Verbatim Transcript, Feb. 17, 1972, Vol. III, p. 402. It is thus the solemn duty of this Court to review the Legislature's work to ensure that the right of suffrage guaranteed to the people by our Constitution is preserved. Although the task of regulating elections is delegated to the Legislature, it must be performed in conformity with the fundamental right to "free and open" elections where no power "shall at any time interfere to prevent the free exercise of the right. . . ." Mont. Const. art. II, § 13.

¶20 The Secretary asserts that the District Court erred in concluding laws implicating the fundamental right to vote are subject to strict scrutiny, arguing that courts have "universally" rejected that standard. Additionally, the Secretary argues that judicial review of laws alleged to be unconstitutional under Article II, Section 13 should be substantially less searching than for other fundamental rights contained in Article II because Article IV,

---

[13] Montana Constitutional Convention Commission, Convention Study No. 11, 25: Suffrage and Elections (1971) (quoting Lyndon Baines Johnson).

14

Section 3 created a countervailing constitutional interest by tasking the Legislature with "provid[ing] by law the requirements for . . . administration of elections" and "insur[ing] the purity of elections. . . ." The Secretary urges us to adopt the federal voting rights test laid out in *Anderson v. Celebrezze,* 460 U.S. 780, 789, 103 S. Ct. 1564, 1570 (1983) and *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S. Ct. 2059, 2063 (1992), which engages in strict scrutiny review only of laws preliminarily found to constitute a "severe" burden on the right to vote.[14] However, we decline in this preliminary injunction appeal to adopt a new standard, as "the very purpose of a preliminary injunction is to maintain the status quo pending that final determination." *Planned Parenthood of Mont.*, ¶ 20 (citing *Sandrock*, ¶ 16); *see Driscoll*, ¶¶ 20, 24.

¶21 We addressed these arguments just two years ago in *Driscoll* when we reviewed a similar request to enjoin a Montana election law restricting the ability of individuals to collect and convey absentee ballots. *Driscoll*, ¶ 5. Like here, the Secretary[15] argued that the district court erred by applying strict scrutiny to the legislation, that the right of suffrage is not absolute and must be balanced against the regulatory power the Constitution confers to the Legislature under Article IV, and urged this Court to adopt the more flexible balancing approach set forth in *Anderson* and *Burdick.* We held

---

[14] Notably, unlike the federal constitution, the Montana Constitution contains an explicit grant of the right to vote. Mont. Const. art. II, § 13. *See also* Mont. Const. art. IV, § 2 ("Any citizen of the United States 18 years of age or older who meets the registration and residence requirements provided by law is a qualified elector unless he is serving a sentence for a felony in a penal institution or is of unsound mind, as determined by a court.").

[15] In *Driscoll*, the Secretary of State was Corey Stapleton.

> At this stage of the proceedings, we find it unnecessary to set forth a new level of scrutiny. The case is not before us on a full evidentiary record for evaluation of the ultimate merits. We conclude that, for purposes of resolving the instant preliminary injunction dispute, the level of scrutiny is not dispositive to the issues presented on appeal.

*Driscoll*, ¶ 20. Having found the level of scrutiny not dispositive, we evaluated the parties' evidence under the preliminary injunction standard set forth in § 27-19-201(1), (2), MCA. *Driscoll*, ¶¶ 20-24.

¶22 In *Driscoll*, the law's challengers presented evidence of the significant impact that the ballot-collection restriction would have on distinct voting groups that relied on the practice. *Driscoll*, ¶ 5. The law's challengers argued that the absentee ballots and ballot-collection efforts were particularly significant for Native American voters, pointing to evidence that Native Americans, as a group, experience greater barriers to in-person or mail voting and that voter turnout in this group had increased substantially in recent years because of ballot-collection measures. *Driscoll*, ¶¶ 6-7. The Secretary argued that alternative means of returning ballots or voting in person were equally open to all voters. *Driscoll*, ¶ 22.

¶23 We held that the law's challengers had presented sufficient evidence for purposes of obtaining a preliminary injunction. *Driscoll*, ¶¶ 22-24. Moreover, we concluded that the Secretary had failed to present evidence of voter fraud, "generally or as related to ballot-collection efforts, occurring in Montana" with which to support the asserted State interest in ensuring voter confidence and guarding against abuses of the process. *Driscoll*, ¶ 22. Ultimately, we held that the district court did not manifestly abuse its discretion in

temporarily enjoining the legislation because the evidentiary record demonstrated the "possibility of irreparable injury" through the loss of a constitutional right. *Driscoll*, ¶¶ 20, 24-25.

¶24 *Driscoll* controls here. As in *Driscoll*, for purposes of this preliminary injunction appeal, we need not definitively settle on a specific level of scrutiny—including how to "balance" the fundamental right to vote with the Legislature's power to administer elections. Indeed, it is inappropriate to decide such an important matter as what level of scrutiny to apply to a fundamental right in a preliminary judgment context where the record is undeveloped, the arguments on the merits have not been made, and we do not have the benefit of the trial court's analysis. As such, we will affirm the preliminary injunction if the record demonstrates that the Appellees have made either a prima facie case under § 27-19-201(1), MCA, that they will suffer some degree of harm and are entitled to relief,[16] or a prima facie case under § 27-19-201(2), MCA, that they will suffer an "irreparable injury" through the loss of a constitutional right. Because the subsections of § 27-19-201, MCA, are written disjunctively, *Bam Ventures*, ¶ 14, in considering the District Court's decision to grant a preliminary injunction, we need only conclude that the District Court did not manifestly abuse its discretion with respect to *either* subsection (1) or (2) of § 27-19-201, MCA. Importantly, and as the District Court found, Appellees have

---

[16] Under § 27-19-201(1), MCA, a court's conclusion could require the level of scrutiny to be set forth because subsection (1) requires an inquiry into whether the applicant has made a prima facie case of entitlement to relief. However, as discussed above, § 27-19-201(2), MCA, merely requires a prima facie showing of an irreparable injury, and can be satisfied by demonstrating the loss of a constitutional right.

established a prima facie case of irreparable injury through the loss of a constitutional right; therefore, we will not address whether Appellees made a prima facie case under subsection (1) of § 27-19-201, MCA.

¶25 Based on our well-established precedent that the loss of a constitutional right constitutes an irreparable injury, we focus our inquiry on subsection (2): whether Appellees have made a prima facie case that SB 169 and HB 176 will cause them irreparable harm by unconstitutionally burdening their fundamental right to vote and whether the District Court has manifestly abused its discretion in granting the preliminary injunction, under any applicable level of judicial scrutiny.

<u>SB 169</u>

¶26 The Secretary challenges the District Court's conclusion that Appellees made a prima facie case that SB 169 unconstitutionally burdens the right to vote. However, the record demonstrates that SB 169's impact on the right to vote, at least for purposes of the preliminary injunction standard here, is far from the "modest change" imposing a "minimal burden" to advance the interests asserted by the Secretary. The District Court received a significant amount of testimony from both parties that illuminated the extent of the asserted injury to the fundamental right to vote. Appellees presented expert testimony that the measure "imposes a burden on college students, who fall into an age group less likely to possess a driver's license than older voters, and on out-of-state students attending a Montana university who likely will not have a Montana license or ID."[17] Additionally,

---

[17] The expert further testified that "[c]ollege-age students, in general, are less likely than the general population to possess a driver's license or ID" and that "[i]n Montana, 71.5% of the

18

out-of-state students[18] "who do not possess a Montana driver's license or state ID will be at a particular disadvantage if their student ID no longer qualifies as a primary voter ID." The District Court also noted expert testimony regarding youth voter turnout in Montana that SB 169 "implemented a measure known to disproportionately impact youth voters," a class that "is uniquely vulnerable due to its predominance of first-time voters and highly mobile voters" and that "young people and students are disproportionately less likely to have a driver's license" than the population at large. The testimony indicated that measures similar to SB 169 have negatively impacted young voters to a substantial degree elsewhere in the country. Further, the secondary forms of identification required by SB 169 when voting with a student ID are of a sort students are particularly unlikely to carry or own: "[b]ecause [student-voters] *live in dormitories and/or are highly mobile . . . [they] often do not own the secondary proof* of identification with current residence listed therein which SB 169 requires to accompany a Student Photo ID—i.e., a current utility bill, bank statement, paycheck, government check, or other government document." (Emphasis added.)

¶27 Conversely, the Secretary provided expert witnesses who described the "linkage between photographic identification laws and [voter] turnout" as "fairly weak" and who asserted that all "newly registered voters since the implementation of SB 169 have received

population aged 18-24 has a Montana driver's license, well behind the total license possession rate of 94.7% among the 18 or older population in Montana."

[18] The Montana University System has more than 10,000 students that arrived from out-of-state.

a confirmation of voter registration in the form of a government document containing their name and address" that could be "paired with a photo ID containing [the voter's] name" to use as identification to vote.

¶28 The District Court, in reconciling the evidence presented by the parties, credited the Appellees' expert testimony as "reliable and informative," and found that the "additional hoops" that young people, particularly students arriving from out-of-state, will have to go through "will raise the cost of voting" in a way that is "unique to young voters given their mobility and the fact that they are less likely to possess the primary forms of ID and the forms that must be presented in addition to the student ID." There is no contention that these factual findings are clearly erroneous. They are entitled to deference on appeal. *See Driscoll*, ¶ 23 ("The Secretary has not demonstrated clear error in the District Court's finding of sufficient evidence for a preliminary injunction of a disproportionate burden to Native American voters' right against interference with the free exercise of the right of suffrage." (alterations omitted; quotations omitted)); *In re A.M.M.*, ¶ 10.

¶29 Turning to the Secretary's asserted interest in deterring and detecting voter fraud and safeguarding voter confidence, the Secretary points to isolated instances of voter fraud in Montana, though none related to the use of student IDs. With regard to voter confidence, an expert for the Secretary testified that there was "some evidence the photographic identification laws bolster confidence in elections."[19] Appellees provided expert testimony

---

[19] A 2020 report put out by the Secretary's office before the general election stated that its existing election security efforts and partnerships had "provided confidence that Montana election systems are highly secure." 2020 State of the Montana Secretary of State, Corey Stapleton, Montana Secretary of State at 3, *available at* https://sosmt.gov/wp-content/uploads/state-of-sos-2020.pdf.

that "voter fraud of any sort is vanishingly rare in Montana, with only a handful of cases over the last 20 years," during which time over eight million votes were cast, and that voter fraud "does not remotely present a problem for or threat to election security in Montana." The District Court ultimately found that "there have been no instances of student ID-related election fraud since the allowance of student IDs as voter identification" and that "voter fraud in general is rare in Montana." As in our *Driscoll* decision, the Secretary has failed to "present evidence . . . of voter fraud . . . generally" in Montana, or as related to the specific measure at issue, with which to support an asserted interest in "ensur[ing] voter confidence in the electoral process and . . . guard[ing] against abuses of that process." *Driscoll*, ¶ 22.

¶30 The Secretary asserts that student IDs are less reliable because they are less uniform, and that "strict photo-ID laws" must be used as a preventative measure against possible future voter fraud and to safeguard public confidence.[20] However, SB 169 promoted concealed-carry permits to the list of primary forms of voter ID that may be used on a stand-alone basis. Concealed-carry permits in Montana are neither uniform nor strict photographic identification. Rather, they are administered on a county-by-county basis and are not required by Montana statute to bear a photograph with the permit-holder's likeness. *Compare* §§ 45-8-321, -322, MCA (providing for issuance of concealed carry permits by county sheriffs and making no photograph requirement) *with* § 61-5-111, MCA

---

[20] The majority of student IDs in Montana are issued by Montana University System state institutions, which require a showing of a form of government-issued identification to receive.

(providing items that a Montana driver's license must contain, including a full-face photograph of the licensee). It is undisputed on the preliminary injunction record at hand that SB 169's ID requirements establish *identity*, not residency or eligibility, and the District Court heard testimony that most of SB 169's acceptable primary forms of ID "do not actually confirm a voter's eligibility or address, as noncitizens can obtain every form of ID other than a passport or Tribal ID, and primary IDs are not required to have the voter's current registered address." The District Court did not err by finding SB 169 did not serve an asserted interest in using *uniform* and credible *photographic* identification to combat voter fraud, when it simultaneously provided for use of county-issued, photo-less concealed-carry permits to access the polls.

¶31 Ultimately, the District Court found that SB 169 targets one class of voters, young people, and students from out-of-state in particular. The Secretary failed to present sufficient evidence to rebut Appellees' prima facie case that SB 169 would disproportionately impact and violate their right to vote.[21] *See, e.g.*, *Driscoll*, ¶¶ 22-23 ("More importantly, the Secretary has pointed to no evidence in the preliminary injunction record that would rebut the District Court's finding of a disproportionate impact on Native American Voters" and has "not demonstrated clear error in the District Court's finding of sufficient evidence for a preliminary injunction").

---

[21] Notably, Speaker of the House Wylie Galt candidly explained his reasoning for supporting SB 169: "[I]f you are a college student in Montana, and you don't have a registration, a bank statement, or a W-2, it makes me kind of wonder why you're voting in this election anyways. So this just clears it up that they have a little stake in the game."

¶32 We conclude the District Court found by substantial credible evidence that Appellees demonstrated a prima facie case that SB 169 will cause them an irreparable injury through the loss of a constitutional right to vote under Article II, Section 13. Because we conclude that the District Court properly enjoined SB 169 pursuant to § 27-19-201(2), MCA, we need not address whether the District Court erred in its findings and conclusions respecting § 27-19-201(1), MCA, or whether the District Court correctly held that SB 169 violates Equal Protection as an alternative basis for granting the preliminary injunction.

### HB 176

¶33 The Secretary also challenges the District Court's conclusion that Appellees made a prima facie case that HB 176 unconstitutionally burdens the right to vote. HB 176 eliminated the option to register on election day, moving the deadline to noon the day before the election. The District Court heard substantial evidence of the popularity and importance of EDR, particularly to Native American voters and young voters, finding that EDR was used in general elections by 7,547 voters in 2008, 12,055 voters in 2016, and over 8,000 voters in 2018 and 2020. As to Native American voters, Native Americans living on reservations face numerous, severe barriers to voting including long distances between voters and election offices and limited access to transportation. Appellees presented expert testimony showing that because of these barriers, Native Americans living on reservations are particularly reliant on EDR—using it at a consistently higher percentage than many other voting groups—and that the elimination of EDR will disproportionately, negatively impact them. Appellees also presented evidence of young

voters' dependence on EDR, showing that young voters account for 31.2% of all election day registrations. The District Court also heard testimony that EDR has "an effect greater than any other change to voting procedures" because "it reduces the cost of voting by combining both registration and voting into a single administrative step," and also "allows voters who are not activated early in the election period the opportunity to register and vote when attention to the election has peaked on election day." Further, Appellees presented evidence of otherwise-eligible voters during 2021 elections being turned away from the polls on election day, including voters turned away because they arrived at the polls the day before election day, but past HB 176's new noon deadline.

¶34 Turning to the Secretary's evidence, the District Court heard testimony challenging the link between EDR and turnout. The Secretary also presented evidence from some election administrators that EDR increased the workload on election staff, resulted in longer lines at the polls, and that eliminating EDR would alleviate these concerns. However, the District Court rejected these concerns, noting Appellees presented opposing testimony from election staff in support of EDR and describing existing procedures to handle the extra work. The Secretary does not claim that these findings are clearly erroneous. The District Court ultimately found that based on the evidence of voters' reliance on and usage of EDR, HB 176 would eliminate an important voting option for Native Americans and would "make it harder, if not impossible, for some Montanans to vote." As such, HB 176 would cause Appellees irreparable harm by unconstitutionally burdening their right to vote.

¶35    The Secretary asserts that eliminating EDR does not violate a constitutional right because Article IV, Section 3 was intended to avoid constitutionalizing EDR, instead leaving decisions regarding EDR's implementation within the Legislature's prerogative.[22] Essentially, because the Legislature "*may* provide for a system of poll booth registration," Mont. Const. art IV, § 3 (emphasis added), it may also choose *not* to provide for such a system.[23]  However, the 1972 Constitutional Convention transcripts reveal that the majority of delegates who spoke were in favor of reducing barriers to voting through EDR, with the eventual majority merely concluding that mandating such a specific procedure in the Constitution could be a mistake if it later proved to be unworkable.  *See* Montana Constitutional Convention, Verbatim Transcript, Feb. 17, 1972, Vol. III, pp. 400-13, 428-52.  *See, e.g.*, Montana Constitutional Convention, Verbatim Transcript, Feb. 17, 1972, Vol. III, pp. 435-36 (Delegate Drum expressing concern that "putting it in a Constitution . . . could become a real mistake at some point in the future if the thing just doesn't work"); Montana Constitutional Convention, Verbatim Transcript, Feb. 17, 1972, Vol. III, pp. 402, 407 (Delegate McKeon arguing in favor of a constitutional right to same-day voter registration because "registration has been the greatest factor in subverting the turnout of the American electorate in the history of our country" and  Delegate Harper,

---

[22] The Dissent would agree with the Secretary's argument and reverse the preliminary injunction as to SB 169 because "the plain language of Article IV, Section 3, as well as its constitutional history, reveals that our Constitution's EDR provision was intentionally made discretionary with the Legislature. Having a provision of the Constitution specifically addressing the issue gives further weight to the Legislature's authority to act on the question." Dissent, ¶ 54.

[23] Neither party contends that the Legislature wholesale lacks the power to eliminate EDR.  The issue is whether the Legislature constitutionally exercised that power.

25

opposing the proposal, noting that "everybody is in favor of the idea" and the only "issue seems to be whether we ought to write it in the Constitution or not"). The delegates' discussion demonstrates they understood Article IV, Section 3 as ultimately protecting the fundamental right to vote. *See* Montana Constitutional Convention, Verbatim Transcript, Feb. 17, 1972, Vol. III, p. 406 (Delegate Dahood stating the now-adopted provision "is placing a limitation upon government, and that is the function of this state Constitution. The minority report is saying to government, to the Legislature, we consider the right to vote so precious and so cherished that you shall not limit it by the artificial barrier of registration").

¶36 While Article IV, Section 3 gives the Legislature discretion to adopt EDR—discretion it validly exercised in 2005—the provision cannot logically be read to nullify the fundamental right to vote in free and open elections separately and principally enshrined in Article II, Section 13. Indeed, first among the fundamental rights expressly guaranteed in the Montana Constitution are popular sovereignty and self-government. Mont. Const. art. II, § 1 ("All political power is vested in and derived from the people."); Mont. Const. art. II, § 2 ("The people have the exclusive right of governing themselves as a free, sovereign, and independent state."). These provisions establish that government originates from the people and is founded on their will only. Protection of our Article II fundamental rights ensures that, among other things, government is indeed founded upon the will of the people only. Undisputedly, the will of the people is expressed through their right to vote, and a healthy, participatory democracy depends on ensuring that as many

26

people as possible vote for the people who represent them. Montana's representatives to the Constitutional Convention understood these benchmark principles and drafted an unequivocal and strong provision protecting the right of suffrage, placing it preeminently in the Article II Declaration of Rights. *See* Mont. Const. art. II, § 13. Therefore, the Montana Constitution first grants the explicit right of suffrage in Article II, and only then delegates to the Legislature specific powers to regulate elections in Article IV. Accordingly, although the Legislature has the discretionary power to provide for EDR, it may not exercise this power in a manner that unconstitutionally burdens the fundamental right to vote.

¶37 HB 176's elimination of EDR undeniably narrowed the late registration period previously available to—and well-used by—Montana voters since 2005. The District Court heard mixed evidence during the preliminary injunction proceedings regarding EDR's workability and impact on election day, with some testimony suggesting EDR may increase election day lines and the burden on election workers and other testimony suggesting election workers had sufficient procedures in place to handle the additional work. Yet based on Appellees' evidence, including expert testimony that EDR "allows voters who are not activated early in the election period the opportunity to register and vote when attention to the election has peaked on election day," the District Court preliminarily enjoined the measure. At this stage of proceedings, the Secretary has not demonstrated clear error in the District Court's finding that HB 176 unconstitutionally burdens the fundamental right to vote by eliminating a widely used and relied on voting option—

particularly by Native Americans—thereby increasing the difficulty of some Montanans to vote.[24] Without reaching any conclusion on the ultimate merits of the issue, we hold that the District Court did not abuse its discretion in concluding that the Appellees made a prima facie showing that HB 176 will cause them irreparable injury sufficient for a preliminary injunction to issue.

## CONCLUSION

¶38 The District Court did not manifestly abuse its discretion in determining that the Appellees had established a threshold prima facie case that SB 169 and HB 176 violated their constitutional right to vote and thus under § 27-19-201(2), MCA, an irreparable injury would occur if the laws were not enjoined. We again emphasize the narrow scope of the Opinion, reflecting application of the standards of review and our precedent governing appellate review of preliminary injunctions. We do not address the ultimate merits of the claims that are to be resolved at trial.

¶39 The District Court's decision to grant a preliminary injunction is affirmed.

/S/ LAURIE McKINNON

---

[24] The Secretary argues that a number of courts in other jurisdictions have upheld similar measures to HB 176, contending that the measures support government interests in conducting orderly elections and that the burden on voters is relatively minor. We need not address these arguments or how they might apply to the relevant provisions of the Montana Constitution here because we do not reach the ultimate merits of the case on preliminary injunction review. *See Planned Parenthood of Mont.*, ¶ 20; *BAM Ventures*, ¶ 7. At trial, with the full development of the record cataloguing the burdens imposed and the interests served, Appellees may well fail or succeed in demonstrating that HB 176 is unconstitutional. Nevertheless, they have made the necessary prima facie showing to receive a grant of a preliminary injunction here.

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON


Justice Beth Baker, concurring and dissenting.

¶40     For the reasons explained in ¶¶ 52-54 of Justice Rice's Dissent, I would reverse the preliminary injunction against HB 176.  I otherwise share the view that it is unnecessary in this appeal to consider or adopt either party's arguments regarding the level of scrutiny that should apply to the Plaintiffs' constitutional challenges to the statutes at issue.  On the preliminary injunction record, I agree with the Court that the District Court did not manifestly abuse its discretion in preliminarily enjoining SB 169.

                                        /S/ BETH BAKER


Justice Jim Rice, dissenting.

¶41     I believe the District Court failed to properly consider and apply all of the governing provisions of the Montana Constitution, and thus correspondingly erred by its broad application of strict scrutiny review to the challenged statutes.  While the appropriate level of scrutiny to be ultimately applied to the statutes would be dependent upon the record established at trial, I would reverse the preliminary injunction based upon analytical errors of law and remand for trial proceedings.

29

¶42 "[I]n our review of a preliminary injunction, we may review whether the district court applied the proper level of judicial scrutiny to enjoin an allegedly unconstitutional statute." *Mont. Cannabis Indus. Ass'n v. State*, 2012 MT 201, ¶ 13, 366 Mont. 224, 286 P.3d 1161 (*MCIA I*) (citing *Butte Community Union v. Lewis*, 219 Mont. 426, 430-31, 712 P.2d 1309, 1311-12 (1986)).

¶43 In *MCIA I*, the district court preliminarily enjoined certain provisions of the Montana Marijuana Act, which restricted the number of registered medical marijuana cardholders who could be served by a registered medical marijuana provider, and prohibited providers from accepting renumeration for their products and services. *MCIA I*, ¶ 4; *see* § 50-46-308(3), (4), (6)(a)-(b), MCA (2011) (repealed effective January 1, 2022). The district court applied strict scrutiny review, reasoning that the challenged statutes "substantially implicate the fundamental rights to employment, to pursue one's own health, and to privacy." *MCIA I*, ¶ 5.

¶44 This Court held that, while privacy, pursuit of employment, and health were fundamental rights under the Montana Constitution, those rights were necessarily circumscribed by the Constitution's language recognizing pursuit of these rights "in all lawful ways." Mont. Const. art. II, § 3;[1] *MCIA I*, ¶ 22 ("[T]he Constitution is clear that the right to seek health is circumscribed by the State's police power to protect the public's

---

[1] Article II, Section 3, of the Montana Constitution reads in full: "All persons are born free and have certain inalienable rights. They include the right to a clean and healthful environment and the rights of pursuing life's basic necessities, enjoying and defending their lives and liberties, acquiring, possessing and protecting property, and seeking their safety, health and happiness in all lawful ways. In enjoying these rights, all persons recognize corresponding responsibilities."

health and welfare.") (citing *Wiser v. State*, 2006 MT 20, ¶ 24, 331 Mont. 28, 129 P.3d 133 ("The Constitution is clear. While it granted the fundamental right to pursue employment, it also circumscribed that right by subjecting it to the State's police power to protect the public's health and welfare.")). The Court further reasoned that, under Article II, Section 3, of the Montana Constitution an individual does "not have a fundamental right to pursue a particular employment or employment free of state regulation," nor does she have "a fundamental affirmative right of access to a particular drug" or medical treatment. *MCIA I*, ¶¶ 18, 20, 24, 28 (citing *Wadsworth*, 275 Mont. at 301, 911 P.2d at 1173). By placing limits on the distribution of medical marijuana, the Legislature had acted within its constitutional police powers, and, for purposes of a preliminary injunction, the challenged statutes did not appear to implicate the subject fundamental rights. Therefore, we held that the district court erroneously applied strict scrutiny review. *MCIA I*, ¶¶ 21, 24, 32.

¶45 At issue here, the Montana Constitution provides fundamental rights of suffrage, to free and open elections, and to equal protection under the laws. Mont. Const. art. II, §§ 4, 13. However, the Montana Constitution also provides express authority to the Legislature to regulate elections and ensure their security. Article IV, Section 3, states:

> The legislature shall provide by law the requirements for residence, registration, absentee voting, and administration of elections. It may provide for a system of poll booth registration, and shall insure the purity of elections and guard against abuses of the electoral process.

Mont. Const., art. IV, § 3.[2]  This specific provision appears to textually provide the Legislature with at least as much authority to act in regard to elections as did the general grant of state police power and the constitutional language limiting pursuit of the fundamental rights at issue in *MCIA I* to "all lawful ways."  *MCIA I*, ¶ 19; Mont. Const. art. II, § 3.  It is apparent that the fundamental right to vote guarantees voting access, but not necessarily a particular form of voting access or elections free of state regulation.  *See MCIA I*, ¶ 20.

¶46    This case, involving explicit Montana constitutional provisions governing the subject matter, necessitates a consideration and balancing of these related provisions, and underscores the difficulties created by broadly applying strict scrutiny review to all laws affecting the fundamental right to vote.  Federal constitutional precedent cautions otherwise.  As the United States Supreme Court has stated, "[e]lection laws will invariably impose some burden" upon voters, *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S. Ct. 2059, 2063 (1992).  The Court explained:

> Each provision of a code, whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote . . . .  *Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently.*

---

[2] I would note that this constitutional provision is lengthier and more specific than a similar provision of the federal Constitution, which requires states to prescribe "[t]he Times, Places and Manner of holding Elections" for their federal senators and representatives, subject to alteration by Congress.  U.S. Const. art. I, sec. 4, cl. 1.

*Burdick*, 504 U.S. at 433, 112 S. Ct. at 2063 (emphasis added) (internal citations omitted); *see also Storer v. Brown*, 415 U.S. 724, 730, 94 S. Ct. 1274, 1279 (1974) ("[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."). Consequently, a universal application of strict scrutiny review to laws implicating the fundamental right to vote, particularly without any consideration of the Constitution's grant of specific regulatory power to the Legislature, would not properly account for the Legislature's constitutional authority and could well "tie the hands" of the Legislature in fulfilling its constitutional mandate to secure elections. *Burdick*, 504 U.S. at 433, 112 S. Ct. 2063; *see e.g.*, *Johnson v. Killingsworth*, 271 Mont. 1, 6-12, 894 P.2d 272, 274-76 (1995) (citing *Ball v. James*, 451 U.S. 355, 371, 101 S. Ct. 1811, 1821 (1981); *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 93 S. Ct. 1224 (1973)) (applying a form of rational basis scrutiny to a landowner requirement for candidates running for irrigation district commissioner). If all election laws that simply bear upon a fundamental right are subject to strict scrutiny review, the Legislature would be constrained from enacting even minor changes, despite the Constitution's charge to the Legislature to, *inter alia*, "insure the purity of elections and guard against abuses of the electoral process." Mont. Const., art. IV, § 3.

¶47     On the other hand, a universal application of rational basis review to all such statutes would fail to provide proper recognition and sufficient protection to the fundamental nature of voting rights. The Legislature's exercise of its regulatory power cannot go so far as to

33

jeopardize this fundamental right afforded to Montanans under our Constitution. In some instances, therefore, strict scrutiny would be warranted. *See Finke v. State ex rel. McGrath*, 2003 MT 48, ¶¶ 4-5, 19-21, 314 Mont. 314, 65 P.3d 576 (applying strict scrutiny to a statute that restricted voting to only real property owners to vote in elections for building code districts, a "general-interest" election, and contrasting *Johnson* as a "special-interest" election); *see also Burdick*, 504 U.S. at 434 (recognizing that restrictions imposing a "severe" burden on voting rights remain subject to strict scrutiny).

¶48     In light of these interpretational challenges, the Secretary and Amicus have asked the Court to adopt the balancing approach provided by the United States Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S. Ct. 1564 (1983) and *Burdick* (the "*Anderson-Burdick* standard*"), and which we discussed in *Driscoll*. *Driscoll*, ¶ 19. Generally, under the *Anderson-Burdick* standard, a court considers challenges to a law regulating elections by weighing "the character and magnitude of the asserted injury" to the plaintiff against "the precise interests put forward by the State as justifications for the burden imposed by its rule." In evaluating the government's asserted interests, the court must consider both "the legitimacy and strength" of the interests, as well as "the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789, 103 S. Ct. at 1570; *see also Burdick*, 504 U.S. at 434, 112 S. Ct. at 2063. The Supreme Court has reaffirmed, and other jurisdictions have adopted, the *Anderson-Burdick* standard. *See generally Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189-91, 128 S. Ct. 1610, 1615-16 (2008); *Obama for Am. v. Husted*, 697 F.3d 423, 429-31 (6th Cir. 2012); *Guare*

*v. State*, 167 N.H. 658, 663, 667-68, 117 A.3d 731, 736, 739-740 (2015); *Milwaukee Branch of NAACP v. Walker*, 2014 WI 98, ¶¶ 26-29, 40, 851 N.W.2d 262, 270, 272 (all describing and applying balancing or intermediate level of scrutiny to election statutes). While there is potential value in the *Anderson-Burdick* standard, I would decline in a preliminary injunction appeal to reach or adopt this test, because the "very purpose of a preliminary injunction is to maintain the status quo." *Planned Parenthood of Mont.*, ¶ 20; *see Driscoll*, ¶ 20. Any further consideration of this standard should be given after presentation by the parties to, and consideration by, the District Court in a final judgment. Notably, however, in *Driscoll*, "for purposes of resolving the instant preliminary injunction dispute," the level of scrutiny employed by the district court was "not dispositive to the issues presented on appeal." *Driscoll*, ¶ 20. In contrast, here the District Court's analytical error in broadly applying strict scrutiny review to all of the challenged statutes is a dispositive issue that should be addressed here. *See MCIA I*, ¶ 13.

¶49    In its Order, the District Court found that the changes to voter identification requirements in Senate Bill 169 (SB 169) would increase the cost of voting for young voters, and concluded, "[b]ased on the additional difficulties young voters who rely on using their student ID as a primary form of ID will face, the Court finds that MDP and MYA have established that SB 169 implicates the fundamental right to vote and would thereby be subject to strict scrutiny review." Then, applying strict scrutiny, the court concluded that removing student IDs as a primary form of voter identification was not narrowly tailored to accomplish the government's stated interests, and implied the

35

Secretary's asserted interests—reducing confusion among election workers, increasing voter confidence in elections, ensuring compliance with residency requirements, and preventing voter fraud—were not compelling in light of the evidence presented at the hearing. While this may have been otherwise sufficient, the District Court did not balance, or give consideration to, the Legislature's duty to regulate elections under Article IV, Section 3, of the Montana Constitution, making no reference to this provision at all. Given the express authority granted to the Legislature by the Montana Constitution, and the authorities discussed above, the determination of the appropriate level of scrutiny requires more than a simple acknowledgment that a statute bears upon a fundamental right, here, the right to vote.

¶50    The Legislature is mandated by the Constitution to "insure the purity of elections and guard against abuses of the electoral process." Mont. Const., art IV, § 3. Voter identification procedures, including forms of voter identification, would appear to fall comfortably within the Legislature's constitutional power to regulate the "administration of elections." Mont. Const., art IV, § 3. While these provisions have yet to be fully interpreted, during the 1972 Constitutional Convention, Delegate Vermillion offered an explanation about the phrase, "insure the purity of elections":

> This is very broad language which would leave the Legislature the power to pass whatever statutes it deems necessary, much as it has in the election laws now, to make sure that there are no frauds perpetrated upon the people of Montana in elections. *It is purposely kept broad to give the Legislature power to keep the elections free of fraud.*

Montana Constitutional Convention, Verbatim Transcript, February 17, 1972, Vol. III, p. 450 (emphasis added).

¶51 The Secretary asserts the Legislature passed SB 169 with the intention of preventing fraud, arguing that "the Legislature was well-within its authority to require that primary ID be government-issued. Student IDs do not have the same level (or perception) of security and reliability as a government-issued ID." It is not our task on an appeal of a preliminary injunction to consider the evidence of the validity of the Legislature's concerns over election fraud, and indeed, such claims may be defeated upon testing of such evidence at a trial on the merits. *See BAM Ventures*, ¶ 7; *Flying T Ranch, LLC v. Catlin Ranch, LP*, 2022 MT 162, ¶ 39, 409 Mont. 478, ___ P.3d ___. Thus, while I would make no determination of the merits of the arguments advanced by the respective parties at this juncture, I would conclude that, given the nature of the subject matter in SB 169, the express constitutional authority given to the Legislature in Article IV, Section 3, to regulate in this area, which was not considered in the Order, and the preliminary injunction record, the District Court erred in applying strict scrutiny review to SB 169.

¶52 House Bill 176 (HB 176) set the deadline for an individual to register to vote or change voter registration information to noon the day before election day. Section 13-2-304(1)(a), MCA. This change eliminates election day registration (EDR), which was adopted in 2005, and effective in 2006. *See* § 13-2-304(1)(a), MCA (2005) ("An elector may register or change the elector's voter registration information after the close of regular registration . . . and vote in the election if the election administrator . . . receives and

verifies the elector's voter registration information prior to the close of the polls on election day."). Thus, HB 176 revises only the "late registration" option, as the deadline for regular voter registration remains 30 days before election day. Section 13-2-301(1)(a), (4), MCA. Under HB 176, voters may still register late, obtain a ballot, and return the ballot on or before election day. Section 13-2-304(d), MCA. Voters are therefore still permitted, anytime within the late registration period and until noon the day before the election, to register and vote on the same day; HB 176 only prohibits both registration and voting on election day itself—EDR.

¶53 While the District Court's preliminary findings and Appellees' contentions regarding Montanans' reliance on EDR are subject to further testing at a trial on the merits, I would note that, at the time the Legislature passed HB 176, EDR had been an option in Montana state elections for only the prior 15 years. The Montana Constitution specifically addresses this issue, giving the Legislature discretion on whether or not to adopt EDR: "[The legislature] *may provide* for a system of poll booth registration."[3] Mont. Const., art IV, § 3 (emphasis added). This discretionary language contrasts with the mandatory language found within the same constitutional provision, that the Legislature "*shall provide* by law the requirements for residence, registration, absentee voting, and administration of elections," and "*shall* insure the purity of elections and guard against abuses of the electoral process." Mont. Const., art IV, § 3 (emphasis added). The records of 1972 Montana

---

[3] "Poll booth registration" is another term for EDR. *See* Montana Constitutional Convention, Verbatim Transcript, February 17, 1972, Vol. III, pp. 410, 412.

Constitutional Convention give additional insight into the process of adopting the permissive language and its purpose, as the delegates debated the EDR provision extensively, primarily over whether to require EDR or to leave that decision to the Legislature. *See generally* Montana Constitutional Convention, Verbatim Transcript, February 17, 1972, Vol. III, pp. 400-13, 429-52. At the time of the Convention in 1972, voter registration in Montana ended 40 days prior to election day. Rev. Code Mont. § 23-3016 (1971). While further insight can be derived from the Convention debates, the final decision of the Convention is summarized by the comments of Delegate Etchart, who reported that the majority of the committee examining the issue was "extremely reluctant to freeze for all time the schedule and administrative process of elections." Montana Constitutional Convention, Verbatim Transcript, February 17, 1972, Vol. III, p. 400.

¶54 For purposes of this appeal, the plain language of Article IV, Section 3, as well as its constitutional history, reveals that our Constitution's EDR provision was intentionally made discretionary with the Legislature. Having a provision of the Constitution specifically addressing the issue gives further weight to the Legislature's authority to act on the question. Therefore, upon the analytical errors discussed above, and upon this record, I would conclude the District Court erred by applying strict scrutiny review to its consideration of the challenge to HB 176 at this stage of the proceeding.

¶55 The Legislature has the constitutional power to regulate elections, as enumerated in Article IV, Section 3, of the Montana Constitution. The Legislature's regulatory discretion is limited by the fundamental nature of voting rights set forth in Article II, Section 13, of

the Montana Constitution, and the right of equal protection under the law, set forth in Article II, Section 4, of the Montana Constitution.

> "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."

*Big Spring v. Jore*, 2005 MT 64, ¶ 18, 326 Mont. 256, 109 P.3d 219 (quoting *Bush v. Gore*, 531 U.S. 98, 104-105, 121 S. Ct. 525, 530 (2000)).

¶56    However, for the reasons set forth herein, and on this record, I would conclude the District Court erred by applying strict scrutiny review to preliminarily enjoin SB 169 and HB 176. Upon this error of law, I would reverse the preliminary injunction and remand for further proceedings. Again, the appropriate level of scrutiny that ultimately would be applied to the challenged statutes would be established based upon the record established upon a trial of the merits.

¶57    I dissent.

/S/ JIM RICE

Justice Dirk Sandefur joins in the dissenting Opinion of Justice Rice.

/S/ DIRK M. SANDEFUR